UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------

JULIO ROCHA,

                    Plaintiff,

          - against -                           16 CV 02327 (RJD) (RML)

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, and AXIS SPECIALTY EUROPE
SE,

                    Defendants.
-----------------------------------------------------------------


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT


CLYDE & CO US LLP

Michael A. Knoerzer
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel: (212) 710-3900
Fax: (212) 710-3950

*Attorneys for Defendants Certain Underwriters at Lloyds and Axis Specialty Europe SE*

## TABLE OF CONTENTS

PAGE(S)

TABLE OF AUTHORITIES ............................................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................................... 1

FACTS ................................................................................................................................................. 2

   I.    The Allegations Against Plaintiff ............................................................................................. 2

   II.   Plaintiff's Claim for Coverage ................................................................................................. 4

   III.  The Structure of FIFA ............................................................................................................ 6

   IV.  The Policy ............................................................................................................................... 8

LEGAL STANDARD .......................................................................................................................... 9

ARGUMENT ..................................................................................................................................... 10

   I.    The Court Lacks Subject Matter Jurisdiction In This Case ................................................... 10

     A. There Is No Diversity Jurisdiction Over Plaintiff's Claim................................................... 11

     B. There Requirements for the Exercise of Ancillary Jurisdiction Over Plaintiff's Claim
        Are Not Met ...................................................................................................................... 11

       i. There Is No Common Nucleus of Operative Fact and No Interdependence Between
         the Two Cases .............................................................................................................. 12

   II.   Plaintiff Cannot State a Claim Under the Policy Because He Is Not an Insured Person....20

   III.  AXIS Specialty Europe SE Is Not a Proper Party and Must Be Dismissed ...................... 22

   IV.  Switzerland Is the Proper Forum for This Case and Swiss Law Applies .......................... 24

   V.   Service of Process Was Improper But Has Been Cured .................................................... 25

CONCLUSION.................................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advani Enterprises, Inc. v. Underwriters at Lloyds,*
  140 F.3d 157 (2d Cir. 1998)...................................................................................................11

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).....................................................................................................9, 10

*Ashraf v. Jasper,*
  2010 WL 2990102 (E.D.N.Y. July 27, 2010)........................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007)...........................................................................................................9

*Canaday v. Koch,*
  598 F. Supp. 1139 (E.D.N.Y. 1984) ......................................................................................18

*Catalano v. BMW of North America, LLC,*
  2016 WL 3406125 (S.D.N.Y. June 16, 2016) ........................................................................10

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F.2d 42 (2d Cir. 1991).................................................................................................10, 21

*DiLaura v. Power Auth. of State of N.Y.,*
  982 F.2d 73 (2d Cir. 1992).........................................................................................................18

*Fortunoff v. Triad Land Assoc.,*
  906 F. Supp. 107 (E.D.N.Y. 1995) ......................................................................................18

*Garcia v. Teitler,*
  443 F. 3d 202 (2d Cir. 2006)......................................................................................................14

*Halebian v. Berv,*
  644 F.3d 122 (2d Cir. 2011).......................................................................................................21

*Hertzner v. U.S. Postal Service,*
  2007 WL 869585 (E.D.N.Y. Mar. 20, 2007)........................................................................10

*Hoops v. KeySpan Energy,*
  794 F. Supp. 2d 371 (E.D.N.Y. 2011) ......................................................................................9

*Kokkonen v. Guardian Life Ins. Co. of America,*
  511 U.S. 375 (1994)...........................................................................................12, 13, 14, 15

*Lansing Research Corp. v. Sybron Corp.*,
  514 F. Supp. 543 (N.D.N.Y. 1981)........................................................................10

*Lanvin, Inc. v. Colonia, Inc.*,
  776 F. Supp. 125 (S.D.N.Y. 1991) ........................................................................18

*Levitt v. Brooks*,
  669 F. 3d 100 (2d Cir. 2012)..................................................................................14

*Li v. Certain Underwriters at Lloyd's London, et al.*,
  15-cv-06099 .........................................................................................1, 18, 19, 23

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)....................................................................21

*McDonald v. Oliver*,
  642 F.2d 169 (5th Cir. 1981) .................................................................................14

*Mijares v. County of El Paso*,
  2016 WL 206481 (W.D. Texas January 15, 2016) ..................................................14

*National Presto Indus., Inc. v. Dazey Corp.*,
  1995 WL 35394 (N.D. Ill. Jan. 27, 1995)...............................................................14

*Owen Equip. & Erection Co. v. Kroger*,
  437 U.S. 365 (1978)..................................................................................11, 12, 15

*Peacock v. Thomas*,
  516 U.S. 349 (1996)..........................................................................................12, 14

*Peter Bay Homeowners Ass'n, Inc. v. Stillman*,
  122 Fed. Appx. 572 (3rd Cir. 2004)........................................................................14

*Selective Ins. Co. of American v. Norris*,
  209 F. Supp. 2d 580 (E.D.N.Y. 2002) ....................................................................19

*Sepanski v. Janiking, Inc.*,
  822 F.Supp.2d 309 (W.D.N.Y. 2011).....................................................................10

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)......................................................................................9

*Stein v. KPMG, LLP*,
  486 F.3d 753 (2007)...................................................................................16, 17, 19

*United States v. Microstar, Inc.*,
  1991 WL 144223 (E.D.N.Y. July 19, 1991)...........................................................14

*United States v. Polishan*,
    19 F. Supp. 2d 327 (M.D. Pa. 1998) ................................................................ *passim*

*United States v. Weissman*,
    1997 WL 334966 (S.D.N.Y. June 16, 1997) ....................................................17, 18

*Village of Sylvan Beach v. Travelers Indem. Co.*,
    55 F.3d 114 (2d Cir. 1995)...............................................................................23

**Statutes**

28 U.S.C. § 1332...............................................................................................11, 19

28 U.S.C. § 1335...................................................................................................19

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ....................................10

Swiss Private International Law Act....................................................................25

**Other Authorities**

Fed. R. Civ. P. 22................................................................................................19

http://resources.fifa.com/mm/document/affederation/generic/02/78/29/07/fifastatutsweben_neutr
    al.pdf .............................................................................................................6

http://www.fifa.com/mm/document/affederation/generic/01/48/60/05/fifastatuten2011_e.pdf......6

Rule 12(b)(1).....................................................................................................9, 20

Rules 12(b)(3) and 12(b)(5) .............................................................................10

Rule 12(b)(6)...........................................................................................9, 10, 22, 24

## PRELIMINARY STATEMENT

Plaintiff Julio Rocha comes before this Court seeking coverage under a Directors and

Officers insurance policy to which he is not entitled and for which he cannot establish a claim.

Plaintiff's Complaint relies in large part on the Court's ruling in the case captioned *Li v. Certain*

*Underwriters at Lloyd's London, et al.*, 15-cv-06099 ("*Li*"), in which this Court found that

Plaintiff Eduardo Li was preliminarily entitled to coverage of his criminal defense costs under

the same insurance policy that is at issue here.  However, the two cases are factually distinct, and

Plaintiff cannot rely on the *Li* matter to establish his own entitlement to coverage.

Plaintiff's claim must be dismissed.  As a preliminary matter, this Court lacks the subject

matter jurisdiction necessary to hear Plaintiff's case.  The Plaintiff has alleged no facts

concerning the parties' citizenships that could give rise to diversity jurisdiction.  Moreover, while

Plaintiff alleges that this Court has ancillary jurisdiction over his suit due to its supposed

relationship with the criminal case against him, Plaintiff's insurance coverage claim arises from

an entirely different nucleus of operative facts than those alleged in the criminal case.  In

addition, the insurance coverage claim involves defendants who are entirely unrelated to, and

uninvolved in, the criminal action.  The Court cannot exercise ancillary jurisdiction over this

case without overreaching the constitutionally circumscribed jurisdiction of the federal courts.

Even if this Court did have jurisdiction over this case, Plaintiff cannot state a claim upon

which this Court can grant relief.  Plaintiff conclusorily alleges that he is entitled to coverage

under the policy at issue, but the facts clearly show otherwise.  The policy in question was issued

to the Federation Internationale de Football Association ("FIFA") as the Named Insured, for the

benefit of a defined class of Insured Persons: FIFA's own executives, directors, officers, and

agents.  Plaintiff has never worked for or been associated with FIFA in any capacity that would

1

render him an Insured Person.  In fact, Plaintiff was allegedly employed as president of the

Federacion Nicaraguense de Futbol ("FENIFUT"), and, in his capacity as the FENIFUT

president, allegedly sought and received bribes in connection with the granting of media rights to

FENIFUT-organized football games.  Neither Plaintiff's employment by FENIFUT, nor any

association between Plaintiff and FIFA, rendered Plaintiff an Insured Person, and none of the

wrongful acts Plaintiff allegedly committed relate to any association with FIFA.

      Plaintiff's claim before this Court suffers from additional fatal flaws.  He cannot make out

a claim against AXIS Specialty Europe SE, because that entity did not subscribe to the policy

and provided no insurance thereunder.  In addition, Plaintiff is bound by the contractual choice

of law and choice of forum clauses set forth in the policy in question, pursuant to which Swiss

law applies and Swiss courts have exclusive jurisdiction over claims against the policy.[1]  For all

of the foregoing reasons, the Court should dismiss Plaintiff's case.

## FACTS

**I.**    **The Allegations Against Plaintiff**

      On May 20, 2015, a federal grand jury in the Eastern District of New York returned a

forty-seven count indictment against fourteen defendants, including Plaintiff Julio Rocha (the

"Criminal Action").  A Superseding Indictment was filed on November 25, 2015.  (*See* Ex. A to

Declaration of Michael A. Knoerzer, dated June 10, 2016 ("June 10, 2016 Knoerzer Decl.").)

      The Superseding Indictment alleges that Plaintiff, while president of the Federacion

Nicaraguense de Futbol ("FENIFUT"), accepted bribes from purchasers of media rights to

football matches that FENIFUT organized and promoted.  (*See* Ex. A to June 10, 2016 Knoerzer

Decl. at ¶¶ 231-240.)  Specifically, the Superseding Indictment states that "[i]n or about 2011,"

---

[1] While Plaintiff initially failed to properly serve defendants with process, Plaintiff has subsequently
cured that defect.

2

when Plaintiff entered into negotiations with Traffic USA to renew its "exclusive worldwide commercial rights to exploit FENIFUT's rights to home qualifier matches," Plaintiff "asked . . . for a six-figure bribe in exchange for his agreement to award the contract to Traffic USA," and that the bribe payment was sent to him on or about May 26, 2011. (*Id.* at ¶ 250-52.) The Superseding Indictment identifies the May 26, 2011 payment, and another wire transfer made on or about April 27, 2011, as having been "transmit[ted] and cause[d] to be transmitted" by Plaintiff and others, with the intent to "obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." (*Id.* at ¶¶ 407-408.) In connection with his alleged conspiracy to receive, and alleged receipt of, those bribes, Plaintiff is charged with one count of Racketeering Conspiracy (Count 1), one count of Wire Fraud Conspiracy (Count 26), two counts of Wire Fraud (Counts 27 and 28), one count of Money Laundering Conspiracy (Count 29), and one count of Money Laundering (Count 30).

The wire transfers that form the factual foundation of the claims against Plaintiff allegedly occurred in 2011; the Superseding Indictment alleges that Plaintiff was employed by FIFA starting in January 2013. The Superseding Indictment also alleges that Plaintiff "continued to solicit bribe payments in connection with the sale of FENIFUT's future World Cup qualifier rights" even after stepping down as FENIFUT's president. (*See* Ex. A to June 10, 2016 Knoerzer Decl. at ¶ 253.) Specifically, it alleges that on or about February 25, 2014, while Plaintiff was a FIFA development officer, he met with an unnamed co-conspirator to ask whether he would be paid in connection with the sale of FENIFUT's rights to the 2022 World Cup qualifier matches. (*Id.* at ¶¶ 254.) The Superseding Indictment does not, however, indicate that Plaintiff received any illicit payments following the February 25, 2014 meeting, or that he attempted to solicit bribes or perform wrongful acts in any capacity relating to FIFA.

3

## II.   Plaintiff's Claim for Coverage

On November 24, 2015, Plaintiff made a claim for coverage of the defense costs being

incurred in the Criminal Action under Directors and Officers Legal Liability Insurance Policy

number LI1413318000 (the "Policy"), which Defendants Certain Underwriters at Lloyd's,

London ("Underwriters") had issued to the Federation Internationale de Football Association

("FIFA"), as the Named Insured.  (*See* Declaration of Michael A. Knoerzer ("Knoerzer Decl."),

dated July 15, 2016, Ex. A.)  In response to Underwriters' request for further information in

support of Plaintiff's claim, on December 22, 2015, Swiss counsel for Plaintiff sent another letter

to Underwriters' counsel, enclosing purported proof of Plaintiff's employment with FIFA.

(Knoerzer Decl. Ex. B.)  Among the items enclosed was a document titled "Agreement," which

is the contract Plaintiff entered into with FIFA in connection with his work as a development

officer.  (Knoerzer Decl., Ex. C.)

By its unambiguous and express terms, the Agreement creates neither an employment

relationship nor an agency relationship between FIFA and Plaintiff.  The Agreement provides:

> The parties expressly declare that they **do not intend to create
> any employment contract relationship** nor any company law
> relationship by way of this agreement.  **The DO [development
> officer] expressly waives for himself, for his employees (if any),
> for his dependents, heirs and legal representatives any and all
> claims to receive any benefit under FIFA's benefit plans or
> programs**, including but not limited to vacation, attendance bonus,
> pre-retirement leave, optional leave, pension and annuity.  FIFA
> will not make any deduction from the service fee for any income
> taxes nor for social securities, unless required to do so by a
> government regulation[.]  The conclusion of this agreement does
> not entitle either of the parties to conclude further agreements.  The
> DO in particular is entitled to refuse mandates for FIFA without
> stating the reasons for doing so.

(Knoerzer Decl, Ex. C at § 14.1) (emphasis added).  Bolstering the notion that Rocha's role as

development officer did not create an employee-employer relationship, the Agreement

4

specifically obligates Plaintiff to "declare[ ] that he is **registered as self-employed** at the relevant social security institution," and to ensure that "he has adequate insurance coverage for activity-related risks." (*Id.* at § 2.2) (emphasis added). The Agreement also states that there was no "ongoing mandate or a **regularly recurring agency relationship**" between Plaintiff and FIFA, and that Plaintiff was acting "independently, outside the organizational structure of FIFA." (*Id.* at §§ 1.1, 1.2.) (Emphasis added.) The Agreement "only authorise[d] or entitle[d] [Plaintiff] to act as a representative of FIFA in any *de facto* or *de jure* capacity **upon instructions**." (*Id.* at § 1.4.) (Emphasis added.) Plaintiff does not claim, and there is otherwise no evidence to support an allegation, that he ever received any instruction to act as FIFA's agent.

On June 1, 2016, Plaintiff moved this Court for a preliminary injunction seeking coverage of his defense costs. That motion did not include reference to the Agreement, but did include a sworn declaration stating, among other things, that he was "a member, executive or supervisor of FIFA and member of the FIFA Congress" and that he had "acted as a general agent, representative of FIFA and/or part of FIFA's executive staff and was employed by FIFA in a managerial or supervisory capacity." (Declaration of Julio Rocha, dated May 24, 2016, ECF No. 9-10.) Plaintiff provided no documentary evidence in support of his sworn declaration and, as stated above, did not attach or otherwise reference his Agreement with FIFA for the Court's consideration or mention it in his moving papers. At oral argument on the preliminary injunction motion, Plaintiff seemingly abandoned the contention that he was a FIFA employee, but instead argued that, as a consequence of his role with FENIFUT, Plaintiff acted as a "general agent or representative of FIFA." (Knoerzer Decl, Ex. F, Transcript of Civil Cause for Order to Show Cause, Tuesday June 21, 2016 at 19:7-8.). As set forth below, publicly available information about the structure of FIFA, and its relationship with member organizations such as FENIFUT,

5

make plain that Plaintiff's role with FENIFUT does not create any position with FIFA which gives rise to coverage of defense costs under the Policy.

## III.    The Structure of FIFA

In conjunction with the Criminal Action, FIFA has filed a Victim Statement and Request for Restitution ("Victim Statement") in this Court.  The following is drawn from that Victim Statement, as well as from FIFA's governing Statutes; the version of the Statutes currently in force is publicly available at http://resources.fifa.com/mm/document/affederation/generic/02/78/29/07/fifastatutsweben_neutr al.pdf.  The version of the Statutes in force when Plaintiff allegedly committed the acts that form the basis of the indictment, and which is cited herein, is publicly available at http://www.fifa.com/mm/document/affederation/generic/01/48/60/05/fifastatuten2011_e.pdf.[2]

Founded in 1904, FIFA is an unincorporated association organized under Swiss association law, with the goal of promoting and organizing the sport of football (also known as soccer) worldwide.  To facilitate its mission, FIFA works with 209 "member associations" around the world, each of which is responsible for organizing and supervising football in its home country.  (*See* Knoerzer Decl., Exs. D and E, 2011 FIFA Statutes at ¶ 10 and FIFA Restitution Statement at 5.)  Among these member associations is FENIFUT, of which Plaintiff was allegedly at one point the president.  Each member association is also a member of the FIFA Congress, which governs FIFA, and each member association has one congressional vote. (Knoerzer Decl., Ex. D at ¶¶ 12, 23.)  FIFA's statutes provide that in order to become a member, an association must agree to certain obligations and restrictions, and in return gains benefits including membership in the FIFA Congress.  (Knoerzer Decl., Ex. D at ¶ 10.)  Contrary to

---

[2] While the current Statutes are ordered somewhat differently from the 2011 Statutes, all citations to the 2011 Statutes herein also appear in the current version of the Statutes.

6

Plaintiff's contentions, the FIFA Congress is comprised of member associations, not individual officers of member associations. (*Id.* at ¶ 12.)

As set forth in FIFA's Victim Statement, FIFA's status as an association under Swiss law means that each member association exists as an organization separate and distinct from FIFA. (Knoerzer Decl., Ex. E at 4-5, 8.) Under the FIFA Statutes, which are the regulations that govern FIFA, each member association must "manage [its] affairs independently and ensure that [its] own affairs are not influenced by any third parties." (Knoerzer Decl., Ex. D at ¶¶ 13, 17.) Member associations are not affiliates of FIFA. (Knoerzer Decl., Ex. E at 5, 8.) In addition, member associations voluntarily choose to be part of FIFA, and may leave FIFA of their own volition. (Knoerzer Decl., Ex. D at ¶ 16.) Therefore, each member organization must, as a condition of being a FIFA member, retain autonomy over its own business affairs and governance. Moreover, member associations are controlled by their own statutes and their own governing bodies. Each member association's statutes must provide for "a procedure that guarantees the complete independence of the election or appointment" of the association's governing body. (*Id.* at ¶ 17.) The statutes and governing bodies of each member association are therefore entirely independent of FIFA; FIFA does not directly control them. (*Id.*)

Each FIFA member association is also a member of one of six continental confederations, including the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), of which FENIFUT is a member. The continental confederations, like the member associations from which they are formed, are independent entities that choose to join FIFA and follow the FIFA Statutes, but are otherwise separate and independent from FIFA. (Knoerzer Decl., Ex. D at ¶ 17, Ex. E at 5.)   Thus, a person's employment in a member

association does not create any relationship, of an employment nature or otherwise, with FIFA itself.

Although FIFA's Victim Statement names Plaintiff as one of the "corrupt officials" who "paid bribes and diverted money from the local and regional federations to their own pockets," the Victim Statement does not identify Plaintiff as an "employee" of FIFA. (Knoerzer Decl, Ex. E at 15.) The Victim Statement paints the dozens of allegedly "corrupt officials" with a broad brush, generally stating that they "unfairly obtained money from FIFA in the form of salaries, bonuses, benefits, and other compensation." (*Id.* at 17.) It does not specifically describe Plaintiff as the recipient of a regular salary or as anything other than a "development officer," the terms of which title are set forth in Plaintiff's Agreement with FIFA. (Knoerzer Decl., Ex. C at ¶ 1.)

## IV.    The Policy

Underwriters issued the Policy to FIFA for the policy period of December 30, 2014 through December 30, 2015. (*See* Knoerzer Decl., Ex A.) The Policy has a $50,000,000 limit of liability in respect of each and every loss and in the annual aggregate, including costs and expenses. (*Id.* at Risk Details.) The Policy contains a choice of law and forum selection clause stating that, "[f]or any disputes arising under this insurance relationship, a Swiss place of Jurisdiction and the application of Swiss Law shall be deemed to be agreed." (*Id.* at Risk Details and § 9.)

The Policy provides cover "world-wide by the insurer for all sums for which any Insured Persons are held liable on the basis of legal liability provisions for financial losses arising out of wrongful acts, whether actual or alleged, . . . committed in their capacity pursuant to item 1.3." (*Id.* at § 1.1.) Section 1.3 of the Policy, in turn, defines an "Insured Person" to include "present,

8

former and future" members of FIFA's management and supervisory bodies, plus the General

Secretary, executive managers, and FIFA employees "while acting in a managerial or

supervisory capacity" or as "general agents/representatives (Generalbevollmachtig), authorized

signatories and executive staff,"[3] and "Chairmen and executives and any person acting in

comparable function/capacity of any FIFA commission, standing or ad hoc committee." (*Id.* at §

1.3.) Nothing in the Policy expressly grants coverage to FIFA member associations, FIFA

member confederations, or officers in those associations or confederations.

## **LEGAL STANDARD**

"'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it.'" *Hoops v.*

*KeySpan Energy*, 794 F. Supp. 2d 371, 375 (E.D.N.Y. 2011), *citing Makarova v. United States*,

201 F. 3d 110, 113 (2d Cir. 2000). "The standard for reviewing a 12(b)(1) motion to dismiss is

essentially identical to the 12(b)(6) standard, except that 'a plaintiff asserting subject matter

jurisdiction has the burden of proving . . . that it exists." *Id.* at 375-76, *citing Makarova*, 201 F.

3d at 113.

To survive a motion to dismiss under Rule 12(b)(6), Plaintiff must "provide the grounds

upon which [his] claim rests through factual allegations sufficient 'to raise a right to relief above

the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)). The Complaint must allege

"enough facts to state a claim to relief that is plausible on its face." *Starr v. Sony BMG Music*

*Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

---

[3] Generalbevollmachtig refers to a general power of attorney for all legal matters.

556 U.S. 662, 679 (2009). The Court will accept as true the factual allegations in the pleadings, but will not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555-57). When necessary, the Court may also supplement the allegations in the Complaint with facts from documents either referenced the Complaint or relied upon in framing the Complaint. *See Catalano v. BMW of North America, LLC*, 2016 WL 3406125, at *2 (S.D.N.Y. June 16, 2016); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[W]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

In evaluating a motion made under Rules 12(b)(3) and 12(b)(5), the Court will accept as true all factual allegations in the non-movant's pleadings, but may rely on facts and documents outside the Complaint. *Sepanski v. Janiking, Inc.*, 822 F.Supp.2d 309, 312 (W.D.N.Y. 2011); *Hertzner v. U.S. Postal Service*, 2007 WL 869585, at 3 (E.D.N.Y. Mar. 20, 2007).

## ARGUMENT

## I.    The Court Lacks Subject Matter Jurisdiction To Hear This Case

The Court must dismiss Plaintiff's claim because it lacks subject matter jurisdiction to hear his case under either the federal diversity statutes or under a theory of ancillary jurisdiction.[4]

---

[4] While Plaintiff has asserted a claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, "[i]t is well settled that the Declaratory Judgment Act 'does not independently create federal jurisdiction.'" *Lansing Research Corp. v. Sybron Corp.*, 514 F. Supp. 543, 545 (N.D.N.Y. 1981), *citing Warner-Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184, 186 (2d Cir. 1977), *citing Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950). Therefore, Plaintiff must establish some other basis for federal jurisdiction in order to assert his federal declaratory judgment claim.

### A.    There Is No Diversity Jurisdiction Over Plaintiff's Claim

Plaintiff has alleged, and has the burden of proving, the presence of diversity jurisdiction. (Complaint at ¶ 9.)  *See Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998) ("The party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete.").  As a condition for the existence of diversity jurisdiction, at least one of the parties must be a citizen of a State.  Plaintiff is alleged to be a citizen of Nicaragua, and is not alleged to be a citizen of any State.  (Complaint at ¶ 6.)  Plaintiff makes no allegations about Underwriters' citizenship except that they are "diverse" from Plaintiff.  (*Id.* at ¶ 9.)  Without any allegation that Underwriters are citizens of any State, as required for federal diversity jurisdiction in a case involving a non-citizen such as himself, Plaintiff's diversity allegations are facially deficient. *See Advani*, 140 F.3d at 161 (no diversity jurisdiction in case against certain Lloyd's underwriters where the pleadings "identify neither the citizenship of the individual investors nor the citizenship of the managing/lead underwriter. . . . As a result, the complaint does not establish that this action is between a citizen of the United States and a citizen or subject of a foreign state.")[5]

### B.    The Requirements for the Exercise of Ancillary Jurisdiction Over Plaintiff's Claim Are Not Met

Ancillary jurisdiction represents "the constitutional limits of federal judicial power." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 371 (1978) ("*Owen Equipment*"); *see also United States v. Polishan*, 19 F. Supp. 2d 327, 332 (M.D. Pa. 1998) ("*Polishan*").  When

---

[5] Defendants include five Lloyd's of London syndicates, each of which is organized pursuant to the laws of the United Kingdom, and each of which has its principal place of business in London, England.  Non-subscriber to the Policy AXIS Specialty Europe SE is organized under Irish law, and has its headquarters in Dublin, Ireland.  Plaintiff has made no allegations and submitted no evidence suggesting that any of the Defendants, or their principals, constitute citizens of any of the United States.  It appears that Plaintiff has all but abandoned his contention that subject matter jurisdiction exits on the basis of diversity jurisdiction.

11

considering whether ancillary jurisdiction exists, it is "to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) ("*Kokkonen*"); *see also Ashraf v. Jasper*, 2010 WL 2990102 at *1 (E.D.N.Y. July 27, 2010) (quoting *Kokkonen*). Neither judicial efficiency nor the convenience of the parties is sufficient to create ancillary jurisdiction. *See Owen Equipment*, 437 U.S. at 377 ("[N]either the convenience of the litigants nor considerations of judicial economy can suffice to justify extension of the doctrine of ancillary jurisdiction to a plaintiff's cause of action.").

### i.   There Is No Common Nucleus of Operative Fact and No Interdependence Between the Two Cases

In determining whether ancillary jurisdiction exists, the crucial consideration established by the United States Supreme Court is whether the federal and non-federal claims "derive from a common nucleus of operative fact" to such a degree that, "considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding." *Owen Equipment*, 437 U.S. at 371. In order for a federal court to exercise jurisdiction over a state law claim, the state law claim must "depend at least in part upon the resolution of the primary lawsuit." *Id.* at 376. The Supreme Court has "cautioned against the exercise of jurisdiction over proceedings that are entirely new and original . . . , or where the relief [sought is] of a different kind or on a different principle than that of the prior decree." *Peacock v. Thomas*, 516 U.S. 349, 358 (1996) (alteration in original) (internal citations omitted).

The *Kokkonen* case is instructive in emphasizing the necessity that the state law claim must depend in part upon the resolution of the primary federal claim. In *Kokkonen*, the parties settled their federal court litigation concerning a dispute under a general agency agreement, and,

12

upon settlement, the district court dismissed the suit.  Subsequently, one party declared that the

settlement agreement had been breached and commenced an action in the district court to enforce

the settlement agreement, asserting ancillary jurisdiction as the basis of the court's authority to

hear the action on the settlement agreement.  Both the District Court and the Court of Appeals

ruled that ancillary jurisdiction existed over the action to enforce the settlement agreement that

arose from the resolution of a federal court claim.  The Supreme Court disagreed and reversed.

The Court explained that the "two separate, though sometimes related, purposes" of

ancillary jurisdiction are: "(1) to permit disposition by a single court of claims that are, in

varying respects and degrees, factually interdependent . . .; and (2) to enable a court to function

successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its

decrees."  *Kokkonen*, 511 U.S. at 379-80 (internal citations omitted).  As to the first purpose of

ancillary jurisdiction, the Court stated that "the facts underlying respondent's dismissed claim for

breach of agency agreement and those underlying its claim for breach of settlement agreement

have nothing to do with each other; it would neither be necessary nor even particularly efficient

that they be adjudicated together."  *Id.* at 380.  As to the second purpose, the Court held that the

district court's order dismissing the lawsuit over the agency agreement was "in no way flouted or

imperiled by the alleged breach of the settlement agreement," which had not been incorporated

into the order.  *Id.*

*Kokkonen* establishes that even if the parties are the same and the state law claim derives

from the federal claim, ancillary jurisdiction will not be found where resolution of the state law

claim does not rely upon resolution of issues in the federal claim, or where the assertion of

ancillary jurisdiction over the state law claim is not necessary for a court to enforce its orders in

the federal court claim.  As a consequence, ancillary jurisdiction does not exist merely because

13

the parties to two actions are the same, or because there are some common facts between the two

actions, or because efficiency would result. *See Polishan*, 19 F. Supp. 2d at 333 (federal

jurisdiction "is not just a matter of fostering judicial economy, minimizing litigants' costs, or

protecting court officers," but "on the contrary, a matter of ensuring that federal judicial power is

exercised only in a case or controversy within a federal court's limited subject matter

jurisdiction").[6]

    The requirements of *Kokkonen* are not satisfied in this case and no ancillary jurisdiction

exists.

    First, the state law case here (the insurance coverage action) is in no way interdependent

upon any issue that is to be resolved by this Court in the Criminal Action.  The Plaintiff has been

accused of violating federal RICO statutes and conspiring to violate and actually violating

federal wire fraud and money laundering statutes, in connection with his alleged solicitation and

receipt of bribes as President, and then former-President, of FENIFUT.  The critical issues to be

determined in the Criminal Action relate to whether Plaintiff committed particular acts – for

example, receiving illicit bribes wired through United States banks – that give rise to criminal

---

[6] The vast majority of cases over which federal courts exercise ancillary jurisdiction involve fee disputes
between an attorney and client who have both already been before the Court in the underlying matter.
*See, e.g. Levitt v. Brooks*, 669 F. 3d 100 (2d Cir. 2012) (fee dispute); *Garcia v. Teitler*, 443 F. 3d 202 (2d
Cir. 2006) (same).  Other cases over which federal courts have exercised ancillary jurisdiction often
involve counter-claims or cross-claims closely related to the federal matter, or involve a court's power to
enforce its own judgments. *See, e.g. McDonald v. Oliver*, 642 F.2d 169 (5th Cir. 1981) (cross-claim);
*United States v. Microstar, Inc.*, 1991 WL 144223 (E.D.N.Y. July 19, 1991) (counter-claim); *Peacock*,
516 U.S. 356-57 (collecting cases involving the exercise of ancillary jurisdiction where necessary to
ensure "the protection and enforcement of federal judgments").  Courts routinely refuse to exercise
ancillary jurisdiction over related state law cases that lack the requisite interdependence with the federal
matter or impact on a federal ruling. *E.g. National Presto Indus., Inc. v. Dazey Corp.*, 1995 WL 35394
(N.D. Ill. Jan. 27, 1995) (no jurisdiction over settlement agreement related to consent judgment and
contempt motion over which the court had jurisdiction); *Mijares v. County of El Paso*, 2016 WL 206481
(W.D. Texas January 15, 2016) (no jurisdiction over action for breach of settlement even though
settlement agreement was enforceable by federal courts); *Peter Bay Homeowners Ass'n, Inc. v. Stillman*,
122 Fed. Appx. 572 (3rd Cir. 2004) (no jurisdiction over action seeking permanent injunction with respect
to easement boundaries drawn by federal court).

culpability under the relevant federal statutes.  None of the elements of any of the crimes for which Plaintiff has been indicted is even remotely related to whether or not Plaintiff's relationship with FIFA entitles him to coverage under the Policy.  The government is not required to show that Plaintiff was a FIFA officer or employee, or that Plaintiff acted in the capacity of a FIFA officer or employee.  The government need only show that Plaintiff solicited and/or received bribes.

On the other hand, the issue in the insurance coverage action relates almost entirely to whether Plaintiff meets the Policy definition of an "Insured Person."  The resolution of this question cannot conceivably be of any interest to the Court in resolving the Criminal Action.  Plaintiff's status as an "Insured Person" will have no ramifications with respect to his guilt or innocence in the Criminal Action.  Plaintiff's state law insurance coverage claim does not, in any way, depend on the resolution of any issues in the Criminal Action, as *Owen Equipment* requires, nor are the two cases "interdependent," as *Kokkonen* requires – they are independent claims, and can be resolved irrespective of each other.

Nor is resolution of the state law claim necessary for the Court to vindicate its authority or to effectuate its decrees in the Criminal Action.  Plaintiff's argument to the contrary suggests that the presence of insurance coverage for defense costs is a necessary condition for the Court to try a criminal action.  Obviously, this cannot be the case.

The only case in which a court considered a factually analogous situation was *Polishan*, in which the District Court for the Middle District of Pennsylvania determined that ancillary jurisdiction did not exist over an insurance coverage claim in which a criminal defendant sought insurance coverage to defend himself from a federal law criminal matter.  The federal criminal case concerned Polishan's actions while chief financial officer of the Leslie Fay Companies, Inc.,

while the state law insurance coverage case raised issues related to the company's bylaws and its D&O policy. Reciting Supreme Court precedent, the court explained that "[a]lthough Polishan's conduct while Leslie Fay's chief financial officer is related to these [insurance] claims in a peripheral manner, it cannot reasonably be maintained that his motion arises out of the same nucleus of operative facts underlying the prosecution." 19 F. Supp. at 332. The court further emphasized that "[t]he alleged criminal conduct is separate and distinct from Polishan's state law claims against Leslie Fay and [its insurer]. Under these circumstances, there is no constitutional basis for ancillary jurisdiction." *Id.*

The *Polishan* court distinguished the matter before it, involving a third-party allegedly liable for defense costs, from cases involving fee disputes between attorneys and their clients arising out of federal litigation. The Second Circuit Court of Appeals made the same distinction in *Stein v. KPMG, LLP*, 486 F.3d 753 (2007) ("*Stein*"). *Stein* involved a contractual fee dispute between a number of KPMG employees charged with tax fraud and KPMG itself, which, while not a party to the federal criminal proceeding, had started and then ceased paying for certain defendants' legal expenses in connection with the criminal matter. The district court had exercised ancillary jurisdiction over the contractual fee dispute, but the Court of Appeals vacated the district court's orders. Distinguishing the case before it from a typical fee dispute, the *Stein* court cautioned:

> [e]xercise of ancillary jurisdiction over a fee dispute between a party and an attorney functioning as an officer of the court in litigation over which a court has jurisdiction is . . . a world away from the exercise of ancillary jurisdiction in a criminal proceeding to adjudicate a contract dispute between the defendants and a non-party former employer.

486 F.3d at 760. Without any indication that the proceeding in question involved interrelated facts and would prove to be "an indispensable remedy," the Court of Appeals held that there was

16

no ancillary jurisdiction. *Id.* at 762. The outcome in *Stein*, which, like the case at bar, involved a contractual claim against a third-party that was a stranger to the federal criminal matter, strongly suggests that the Second Circuit would find that there is no ancillary jurisdiction over Plaintiff's insurance coverage claims.

Both the *Stein* and *Polishan* courts also distinguished the cases before them from the sole case in which a federal court has found the existence of ancillary jurisdiction over a nonparty contractually required to advance defense costs, *United States v. Weissman*, 1997 WL 334966 (S.D.N.Y. June 16, 1997). In that case, the employer in question filed a civil declaratory judgment action seeking a determination as to its defense cost obligation. The *Stein* court distinguished *Weissman* on factual grounds, noting in particular that there, the issue of defense costs arose "at a time when no disposition of the issue could be reasonably obtained in another forum." 486 F.3d at 761 n.2. The *Polishan* court differentiated the matter before it, involving a civil claim ancillary to a criminal matter, from *Weissman*, which involved two civil cases, explaining that "resort to *civil* cases for purposes of delineating the contours of ancillary jurisdiction in a criminal case is unsound." 19 F. Supp. at 333 (emphasis in original).

*Polishan* further criticized the *Weissman* decision for its focus on the purposes of ancillary jurisdiction rather than on its constitutional limits. *Id.* Addressing those constitutional limits, the *Polishan* court explained:

> Polishan's dispute with Leslie Fay or [Insurer] does not arise out of the same operative facts as those animating this federal prosecution. Neither Leslie Fay nor [Insurer] is a party to this case, and the Court does not have control over property from which Polishan's fees would be paid. The only relationship between the present criminal charges and Polishan's motion for payment of fees is that the pending criminal case generates the fees for which Polishan seeks payment. This relationship does not create ancillary jurisdiction.

17

19 F. Supp. 2d. at 333. In contrast to the *Weissman* court, the *Polishan* court emphasized that, while the *goals* of ancillary jurisdiction (efficiency and convenience) might be served by extending jurisdiction over the insurance coverage dispute, the court could not declare the existence of federal jurisdiction merely for the parties' convenience or for the sake of efficiency. *Id.* at 331-32.

As with the insurer in *Polishan*, Underwriters are strangers to the Criminal Action and did not submit themselves to this Court's jurisdiction in this case. In the absence of any relationship between the facts of Plaintiff's contract claim and the facts of the Criminal Action, there is no basis upon which the Court may exercise ancillary jurisdiction here.

In the face of this overwhelming Supreme Court authority, Plaintiff has been reduced to contending hardship.[7] (*See* Knoerzer Decl., Ex. F at 7:2-8, counsel describing Plaintiff's lack of access to sources of funding and agreeing with the Court that Plaintiff and counsel are "on the rope" respecting insurance coverage.) Never has the convenience of the parties, or even hardship of one party, been recognized as a basis to create ancillary jurisdiction. However, hardship or inconvenience has been recognized as a reason *not* to declare the existence of ancillary jurisdiction. For example, in *Stein*, the court explained that "the prejudice to [the third-party] in having these claims resolved in a proceeding ancillary to a criminal prosecution . . . is clear."

---

[7] Plaintiff has also argued that the Court should simply follow its previous decision in *Li*, arguing that the Court's April 14, 2016 order on the plaintiff's motion for a preliminary injunction in *Li* constitutes the "law of the case" here because the two are "related." However, law of the case doctrine is discretionary, and particularly inapplicable where the supposed "law of the case" was made in ruling on a preliminary injunction, and where there are serious questions concerning the court's jurisdiction. *See, e.g., DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992); *Fortunoff v. Triad Land Assoc.*, 906 F. Supp. 107, 113 (E.D.N.Y. 1995); *Canaday v. Koch*, 598 F. Supp. 1139, 1151 (E.D.N.Y. 1984); *Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y. 1991). This case presents different underlying facts, and a different procedural posture, than the *Li* matter, as this Court acknowledged during oral argument on Plaintiff's motion for a preliminary injunction. (Knoerzer Decl, Ex. F at 20:11-16.) Therefore, the Court's ruling in *Li* is not binding here.

18

486 F. Supp. 3d. at 761; *see also Polishan*, 19 F. Supp. 2d at 333 ("[c]riminal procedure bears

little resemblance to civil procedure."). As the *Polishan* court noted, criminal procedure has "no

room for cross claims, counterclaims, third party action, or wide-ranging discovery." 19 F.

Supp. 2d at 333.

There are two other practical reasons why the Court should not find ancillary jurisdiction

to exist in this matter. First, it appears that the remedy of interpleader is not available here in the

absence of either complete or partial diversity.[8] Thus, even if Underwriters should determine

that paying funds into the Court is the most convenient and efficient way to resolve the claims

against the Policy, they will likely be precluded from doing so. The same will be true for

insurers in any future cases drawn unwillingly into federal court in the absence of independent

federal interpleader jurisdiction.

Second, the Court's declaration of ancillary jurisdiction over an insurance policy as

related to a criminal proceeding constitutes a broad new precedent which will surely have a

profound effect upon federal courts. Doubtless in every case where any policy is available that

may potentially provide a defense, criminal defendants will seek to join by ancillary jurisdiction

an insurance coverage dispute. Not only do the criminal defendants have an interest in such

actions, but so do their counsel. It does not take much imagination to foresee dozens of separate

ancillary insurance coverage actions tied to criminal proceedings where multiple defendants are

---

[8] "Rule Interpleader" under Fed. R. Civ. P. 22 "is merely a procedural device, and does not confer federal jurisdiction over a claim." *Selective Ins. Co. of American v. Norris*, 209 F. Supp. 2d 580, 582 (E.D.N.Y. 2002). As there is no independent basis of federal jurisdiction over the parties, Underwriters cannot commence an interpleader action under the rules. Statutory interpleader under 28 U.S.C. § 1335 confers federal jurisdiction over interpleader claims. However, the statute requires minimal diversity among the claimants pursuant to 28 U.S.C. § 1332. Neither Eduardo Li, whose claim for coverage under the Policy is before this Court in the *Li* matter, nor Plaintiff, is a citizen of any State. Nor, to the best of Underwriters' knowledge, are any current claimants under the Policy citizens of any State. Therefore, despite Plaintiff's counsel's unsupported opinion to the contrary, not even the minimal diversity required to establish federal jurisdiction under the interpleader statute is present here, and Underwriters are effectively precluded from interpleading funds before this Court.

indicted. To the extent the goal of ancillary jurisdiction is efficiency, it will be lost if dozens of insurance coverage actions are tied to a criminal proceeding.

For the foregoing reasons, Underwriters respectfully believe that the Court lacks subject matter jurisdiction over this case, and must dismiss it under Rule 12(b)(1).

## II.  Plaintiff Cannot State a Claim Under the Policy Because He Is Not an Insured Person

Assuming jurisdiction exists, the Plaintiff cannot state a claim under the Policy because he is not an Insured Person. He is not a current or former President or Vice President, or member of a FIFA management board, executive committee, or supervisory body. (Knoerzer Decl, Ex. A at § 1.3.) He is not FIFA's General Secretary or an executive manager, nor does he fall under any of the categories for covered employees. He is not a general agent or representative, an authorized signatory or executive staff. *Id.* Plaintiff has made the bare representation that he is entitled to coverage "in his capacity as a FIFA officer, employee and/or member of FIFA management or supervisory bodies," without any supporting information, and certainly without any evidence sufficient to contradict the unambiguous and express terms of the Agreement. By the terms of the Agreement Plaintiff himself has presented to Defendants as putative proof of his entitlement to defense costs, Plaintiff is expressly established to *not* be a FIFA officer, director, employee or agent. Plaintiff is therefore not an Insured Person and is not entitled to coverage under the FIFA Policy.[9]

---

[9] The Agreement is the sole document that creates a relationship of any kind between Plaintiff and FIFA, and is therefore the document on which Plaintiff must rely in making a claim under the Policy. The Complaint, therefore, could only have been framed by reference to the Agreement, and it must be considered incorporated into the Complaint as surely as the Policy itself. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011). The court need not accept as truth any allegations in the Complaint that are contradicted either by statements in the Complaint itself or by documents upon which its pleadings rely. See *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

Plaintiff's Agreement with FIFA specifically states that "[t]he parties . . . do not intend to create any employment contract relationship." (Knoerzer Decl, Ex. C at § 14.1.) In signing, Plaintiff "expressly waives . . . any and all claims to receive any benefit under FIFA's benefit plans or programs," which obviously includes directors and officers insurance protection. (Knoerzer Decl, Ex. C at § 14.1.) Further, the Agreement obligates Plaintiff to "declare[ ] that he is registered as self-employed at the relevant social security institution," and to ensure that "he has adequate insurance coverage for activity-related risks." (*Id.* at § 2.2). By those terms, Plaintiff is clearly not an employee of FIFA and has no rights to FIFA's insurance policies.

The Agreement also states that there was no "ongoing mandate or a regularly recurring agency relationship" between Plaintiff and FIFA, and that Plaintiff was acting "independently, outside the organizational structure of FIFA." (*Id.* at §§ 1.1, 1.2.) The Agreement "only authorise[d] or entitle[d] [Plaintiff] to act as a representative of FIFA in any *de facto* or *de jure* capacity upon instructions." (*Id.* at § 1.4.) Plaintiff does not allege that he received any such instructions. Plaintiff's Agreement specifically disclaims any agency or representative relationship between him and FIFA; he is therefore excluded from that category of coverage under the Policy.

The Superseding Indictment against Plaintiff alleges that he was the President of FENIFUT.[10] As FIFA's own Statutes indicate, individuals do not, by virtue of being employed by or affiliated with member organizations, thereby become employed by or affiliated with FIFA. (Knoerzer Decl., Ex. D, at ¶¶ 13, 17.) Indeed, FIFA's entire structure relies on the separation between itself, as an unincorporated association, and its self-governing member

---

[10] At oral argument on the preliminary injunction, Plaintiff declared that FENIFUT – the body of which Plaintiff served as President – has itself denied coverage of Plaintiff's defense costs. That FENIFUT has, or reasons undisclosed, refused Plaintiff his defense costs does not mean that FIFA – for which Plaintiff has never served as an officer or employee – should expend its policy limits to provide Plaintiff a defense.

21

organizations. Therefore, Plaintiff clearly did not become a member, executive, or supervisor of FIFA merely by filling such a role at FENIFUT. In addition, it is the member associations themselves, and not individuals therein, that form the FIFA Congress. (*Id.* at ¶¶ 12, 23.) Any suggestion that Plaintiff was a member of FIFA's Congress in his personal capacity is belied by FIFA's own rules. None of Plaintiff's duties as a FENIFUT employee, or actions he took on behalf of FENIFUT or of himself while a FENIFUT employee, would bring him under the ambit of the Policy's coverage as an Insured Person.

Regardless of how Plaintiff attempts to recast his relationship with FIFA after the fact, he does not qualify as an Insured Person under the Policy and therefore fails to state a claim under Rule 12(b)(6).

## III.     AXIS Specialty Europe SE Is Not a Proper Party and Must Be Dismissed

Plaintiff has wrongly alleged that AXIS Specialty Europe SE ("AXIS") is a subscriber to the Policy and may therefore be liable for Plaintiff's claims. Plaintiff is incorrect, and AXIS must be dismissed under Rule 12(b)(6). The following insurers are signed onto the Policy: Lloyd's Syndicate 2987, covering 30% of the Policy limit; Lloyd's Syndicate 1686, covering 10% of the Policy limit; Lloyd's Syndicate 1919, covering 20% of the Policy limit; Lloyd's Syndicate 1886, covering 20% of the Policy limit; and Certain Lloyd's Underwriters per Lloyd's Consortium 9860, covering 20% of the Policy limit. (Knoerzer Decl., Ex. A at 10-11). These insurers cover 100% of the risk under the Policy and all are already named in the Complaint. (Complaint (ECF. No. 1) at ¶ 7). AXIS, alternatively, has been explicitly crossed out on the Policy, indicating that it has not subscribed to the Policy. (Knoerzer Decl., Ex. A at 10.) There is no basis under New York law or the Policy language itself to enforce the Policy against an insurer who has not signed onto a policy, and the court can dismiss AXIS as a matter of law. *See*

22

*Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). ("The initial interpretation of a contract is a matter of law for the court to decide.") (quotation omitted).[11]

In arguing to keep AXIS in this lawsuit, Plaintiff advanced two erroneous arguments in his June 14, 2016 Letter (ECF No. 19). First, Plaintiff has suggested that AXIS is properly named because it appears on the Security Schedule (the "Schedule") of the Policy, which purports to list out the participating insurers for "ease of reference" for the insured. (Knoerzer Decl., Ex. A at 39.) However, the Policy explicitly notes the Schedule is "not authorized by the subscribing insurers," and it therefore is not binding on AXIS. This is especially clear since AXIS was explicitly removed from page ten of the policy, which identifies the subscribing insurers. Second, Plaintiff argued that AXIS had not previously raised this argument in the Li litigation. This is false; Underwriters raised this exact issue. See Li, ECF No. 22, Declaration of David S. Schieffer, Ex. 2. ("On a secondary note, Axis Specialty Europe SE does not subscribe to the at-issue policy and, therefore, is improperly named as a defendant in this action."). Because AXIS did not subscribe to the Policy, it cannot be liable under the Policy, and Plaintiff cannot recover against it. Therefore, Plaintiff has failed to state a cognizable claim against AXIS, and the Court should dismiss AXIS from this case under Rule 12(b)(6).

**IV.    Switzerland Is the Proper Forum for This Case and Swiss Law Applies**

In his Declaration in Support of Defendants' Motion to Dismiss, Swiss law expert Professor Doctor Anton K. Schnyder explains in detail why, "[u]nder the terms of the Policy, and under Swiss law, the choice of law and forum selection clauses in the contract are . . . valid and enforceable, both as between Underwriters and FIFA, and as against Plaintiff." (Declaration of Prof. Dr. Anton K. Schnyder in Support of Defendants' Motion to Dismiss, dated July 13, 2016,

---

[11] AXIS does appear on page 10 of the Policy as a participating insurer, but it is clearly and unambiguously crossed out. Maintaining AXIS on the Policy would cause insurers to cover 110% of the Policy Limit, which is nonsensical.

at ¶ 15.)  While the Court may look to Prof. Dr. Schnyder's expert report for a more thorough analysis of the choice of law and forum clauses, in brief, this case should properly be heard by the Swiss courts, which have exclusive jurisdiction over actions under the Policy.

Under the Swiss Private International Law Act ("PILA"), which applies to international contracts such as the Policy, "The contract is subject to the law chosen by the parties." (Schnyder Decl. ¶ 7.)  Thus, the Swiss choice of law clause applies to actions on the contract, including Plaintiff's.

In determining their jurisdiction, the Swiss courts would look to the Lugano Convention, a jurisdictional treaty that applies to both FIFA and Underwriters because they are both domiciled in countries that are signed on to the Convention ("Contracting States").  (*Id*. at ¶¶ 8-10.)  Under the Lugano Convention, the parties to the Policy were free to choose their preferred forum, and their choice is endowed with exclusive jurisdiction.  (Schnyder Decl., at ¶¶ 11-14.)

Under Swiss law, FIFA was entitled to bind third-party beneficiaries with respect to the applicable law and forum, and furthermore, Plaintiff consented to be bound by making a claim under the Policy.  (*Id.* at ¶¶ 20-22.)  None of the law interpreting the Lugano Convention addresses the circumstances currently facing this Court, in which a Plaintiff who is not a citizen of a Contracting State is suing from within another non-Contracting State and is attempting to circumvent a binding forum selection clause.  Therefore, the law interpreting the Lugano Convention is largely inapplicable here, and, in any case, it would not allow Plaintiff to escape the enforcement of the forum selection clause in the Policy.  (*Id.* at ¶¶ 18-26.)  Even if the Swiss courts were to apply PILA, rather than the Lugano Convention, in light of the fact that both Plaintiff's domicile and the forum of his lawsuit are outside the Contracting States, the forum

24

selection clause would be valid and Plaintiff would be bound thereunder. (*Id.* at ¶ 31.)

Therefore, Switzerland is the proper forum for this lawsuit.

**V.      Service of Process Was Improper But Has Been Cured**

In their pre-motion letter to the Court dated June 7, 2016, Underwriters raised the issue

that Plaintiff had failed to properly serve Underwriters with process by the method required

under the Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial

Documents in Civil or Commercial Matters (the "Hague Convention").  However, Plaintiff has

subsequently cured his insufficient service of process, and Underwriters were properly served by

the method prescribed under the Hague Convention on July 11, 2016.

## CONCLUSION

For the foregoing reasons, Underwriters respectfully request that this Court dismiss this

case.

Dated: New York, New York
       July 15, 2016

Respectfully submitted,

By:      /s/ *Michael A. Knoerzer*
         Michael A. Knoerzer

         Clyde & Co US LLP
         The Chrysler Building
         405 Lexington Avenue
         New York, New York 10174
         Tel: (212) 710-3900
         Fax: (212) 710-395

         *Attorneys for Defendants Certain*
         *Underwriters at Lloyds and Axis*
         *Specialty Europe SE*

25