# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
EDUARDO LI,

                Plaintiff,

         - against -

CERTAIN UNDERWRITERS AT LLOYD'S,
LONDON, AXIS SPECIALITY EUROPE SE,

              Defendants.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

15 CV 06099 (RJD) (JO)

DEARIE, District Judge

       Eduardo Li, one of the defendants in the racketeering and fraud prosecution against officials of the Federacion Internationale de Football Association ("FIFA") and its member associations, United States v. Webb, 15 CR 252 (RJD), moves in this civil action for a preliminary injunction on his breach of contract claim directing the defendant insurers ("Insurers") to pay and advance his criminal defense costs. As a threshold matter, however, the Court must address whether it has jurisdiction: Li initially brought this claim in state court; the Insurers, claiming diversity of citizenship, removed; then, in an unusual turn, the Insurers quickly reported that their removal was improper; and Li, conceding the absence of original subject matter jurisdiction but not seeking remand, asks the Court to retain the case by an exercise of its ancillary jurisdiction. As a coda to their latest position on jurisdiction, the Insurers invoke the doctrine of *forum non conveniens* and a forum selection clause in the governing contract as alternative bases to dismiss the action they removed.

       For the reasons that follow, the Court concludes that an exercise of ancillary jurisdiction is proper in this case, that the Insurers' asserted grounds for dismissal are lacking in merit, and that Li has made the necessary showing for the injunctive relief he seeks.

## BACKGROUND

The Insurers sold FIFA a "Directors and Officers Legal Liability Policy" (the "Policy"). Policy § 1.1, ECF No. 13-3. The Policy provides "world-wide" coverage to "Insured Persons" for "defense costs incurred to defend any actual or alleged wrongful acts and also Investigation costs," as well as reasonable legal fees related to extradition proceedings. Id. The definition of an "Insured Person" under the policy includes "present, former, and future" members of FIFA's management and supervisory bodies, as well as the General Secretary, executive managers, and FIFA employees "while acting in a managerial or supervisory capacity," and, "[f]or the avoidance of doubt, the definition of Insured Person extends to include Chairmen and executives and any person acting in comparable function / capacity of any FIFA commission, standing or ad-hoc committee." Policy § 1.3. The Policy includes a willful misconduct exclusion, which provides in relevant part that "[s]hould the question of any wrongful intent be at issue, cover shall be granted for the defence costs," but if an insured person is "found guilty of wrongful intent," he or she "will be obliged to reimburse the Insurer for all payments made on his or her behalf." Policy § 3.1.

Plaintiff, Eduardo Li, a citizen of Costa Rica, has held a number of positions within FIFA and its member associations. Pl.'s Br. Supp. 5 (hereinafter Pl.'s Br.); Def.'s Br. Opp. at 9 (hereinafter Def.'s Br.). He was, as of April 16, 2015, a member-elect of FIFA's Executive Committee; from January 3, 2012, until May 29, 2015, a "Special Advisor" of a FIFA standing committee (the Organizing Committee for the FIFA U-17 Women's World cup); and from October 14, 2013, to May 29, 2015, a member of another FIFA standing committee (the Player Status Committee). Letter from Counsel of FIFA, December 3, 2015, ECF No. 22-6 ¶¶ 2, 4, 6, 7. In addition, Li was the president of the Costa Rican soccer federation (Federacion Costarricense

2

de Futbol, or "FEDFUT") and an executive member of the Confederation of North, Central American and Caribbean Association Football ("CONCACAF").

On May 20, 2015, a grand jury in the Eastern District of New York returned an indictment charging Li and 13 other defendants with participating in an international racketeering conspiracy and related crimes. The indictment alleges that "[a]t various times relevant to the Indictment," Li "served on multiple FIFA standing committees," and charges Li with racketeering conspiracy, wire fraud conspiracy, wire fraud, money laundering conspiracy, and money laundering. Indictment, United States v. Webb, 15-CR-252, ECF No. 1 at 113.

Li was arrested in Switzerland on May 27, 2015. On June 29, 2015, the United States Department of Justice issued a request for his extradition. The government of Switzerland agreed to extradition, and Li was detained there while he appealed to the Swiss Federal Criminal Court.

On July 20, 2015, Li sent a letter to the Insurers, notifying them of his indictment and pending extradition, and requesting payment under the Policy for the cost of his defense. On August 13, 2015, the Insurers responded by letter of counsel, denying any obligation under the policy. The Insurers based their denial primarily on the Policy's "Further USA exclusions" provision, which states, "No cover shall be granted in respect of claims for damages in the USA which are based, in part or whole, on actual or alleged violations of the provisions of . . . Title IX of the Organised Crime Control Act of 1970 (known as the Racketeer Influenced and Corrupt Organisations Act, or RICO) . . . ." ECF No. 13-8 ¶¶ 4-7, Policy § 3.3.2. The Insurers explained that denial of coverage for defense and extradition costs was warranted under this provision because the "principal charge" against Li was racketeering conspiracy under RICO. ECF No.

3

13-8 ¶¶ 4, 7, 12. In the letter, the Insurers referred to this provision as the "RICO exclusion" and designated it the "most important" basis for denial of coverage. ECF No. 13-8 ¶ 6.

In addition, the Insurers cited Section 2.4 of the Policy, "Criminal Defence costs-limited cover," as a basis for denial. ECF No. 13-8 ¶¶ 8-10. That section provides that if "investigative proceedings are initiated in accordance with the provisions of the criminal law, or the law concerning infringement of regulations, or of disciplinary law or codes of professional conduct, the insurer will pay for the costs of the defense of those proceedings." Policy § 2.4. The Insurers explained that they did "not necessarily accept that the RICO Indictment is an 'investigative proceeding,'" and therefore "the prerequisite application of this coverage extension has not been met." ECF No. 13-8, ¶ 10. In concluding the letter, the Insurers reserved the right to assert other bases for the denial of coverage, including "whether [Li] qualifies as an 'Insured Person.'" ECF No. 13-8 ¶ 14.

Li filed suit in Kings County Supreme Court on September 24, 2015, to enforce the Policy. The Insurers removed on October 23, 2015, and, six days later, filed a pre-motion letter indicating their intent to move for dismissal under *forum non conveniens* and a forum selection clause in the Policy, which provides, "For any disputes arising under this insurance relationship, a Swiss place of Jurisdiction and the application of Swiss Law shall be deemed to be agreed." ECF Nos.1-1, 8; Policy § 9. Although claiming to be an Insured Person under the Policy, Li is not a signatory nor did he separately subscribe to the forum selection clause.

On November 18, 2015, Li moved for a preliminary injunction that would direct the Insurers to reimburse and to advance him the defense costs associated with his indictment and extradition. On November 25, 2015, while the motion for a preliminary injunction was pending, a sealed superseding indictment was returned adding new charges as to Li, and naming an

4

additional 16 defendants.  <u>United States v. Webb</u>, 15-CR-252, ECF No. 102.  On December 1,

2015—less than two weeks after Li's request for injunctive relief, and six weeks after their

removal—the Insurers advised the Court that subject matter jurisdiction "may not truly exist in

this case" and that their removal to this Court "may have been a mistake."  ECF No. 18.

Li was eventually extradited, arraigned in this Court, and then detained at the

Metropolitan Detention Center in Brooklyn until his release on bail on March 8, 2016.

Some of Li's legal expenses were paid under a policy purchased by CONCACAF from

Federal Insurance Co., a member of Chubb Insurance Company ("Federal Policy").  The Federal

Policy had a $3 million limit, was subject to claims by Li's co-defendants, and has been

exhausted.  Rosenthal Decl. ¶ 4, ECF No. 32; Pl.'s Reply Br. 6.

DISCUSSION

I.    Ancillary Jurisdiction

The doctrine of ancillary jurisdiction "recognizes federal courts' jurisdiction over some

matters (otherwise beyond their competence) that are incidental to other matters properly before

them."  <u>Kokkonen v. Guardian Life Ins. Co. of American</u>, 511 U.S. 375, 378 (1994)

(parentheses in original).  Ancillary jurisdiction, according to the Supreme Court, has been

properly asserted

> for two separate, though sometimes related purposes: (1) to permit disposition by
> a single court of claims that are, in varying respects and degrees, factually
> interdependent; and (2) to enable a court to function successfully, that is, to
> manage its proceedings, vindicate its authority, and effectuate its decrees.

5

Id. at 379-80 (internal citations omitted); accord Garcia v. Teitler, 443 F.3d 202, 208 (2d Cir. 2006) ("[A]ncillary jurisdiction is aimed at enabling a court to administer justice within the scope of its jurisdiction." (internal quotation marks omitted)).[1]

The circumstances here strongly warrant the exercise of ancillary jurisdiction under both Kokkonen rationales. As for the first, the "factual interdependen[ce]" of the criminal charges and the insurance coverage claim is self-evident: both proceedings turn, in material part, on the nature of positions Li held within FIFA and his conduct while holding those positions. Turning to the second rationale, successful management of Li's criminal case necessarily involves preventing any potential issues or delays from impeding a timely, efficient, and fair trial as to Li and his many co-defendants. See United States v. Weissman, No. S2 94-CR-760 (CSH), 1997 WL 334966, at *7 (S.D.N.Y. Jun. 16, 1997) (exercising ancillary jurisdiction over a fee dispute, in part because the Court would otherwise "be deprived of its ability to control the timing of a criminal case before it, and the conclusion of that case could be subject to extensive delay"). Case management concerns are especially acute now, as the government and defense enter in earnest upon the pre-trial phase of the criminal case.[2]

---

[1] Both the Supreme Court and the Second Circuit acknowledge that delineations of the doctrine are not of the black letter variety, and are subject to interpretation. See Kokkonen, 511 U.S. at 379 ("The doctrine of ancillary jurisdiction can hardly be criticized for being overly rigid or precise."); Garcia, 443 F.3d at 208 ("The boundaries of ancillary jurisdiction are not easily defined and the cases addressing it are hardly a model of clarity.").

[2] A separate factor militating in favor of the exercise of ancillary jurisdiction, though not formally mentioned in the Kokkonen rationales, is the Court's obligation to protect defense counsel in Li's criminal case by ensuring that they are properly compensated in that matter. See Cluett, Peabody & Co. v. CPC Acquisition Co., 863 F.2d 251, 256 (2d Cir. 1988) ("[A] court has a responsibility to protect its own officers in such matters as fee disputes."); see also Weissman, 1997 WL 334966, at *8 ("Ancillary jurisdiction is also warranted by this Court's obligation to protect its officers.").

A factor arguably complicating the ancillary jurisdiction analysis is the fact that the

Insurers are not also parties to the criminal case, a view attributable to remarks in the Second

Circuit's decision in Stein v. KPMG, LLP, 486 F.3d 753 (2d Cir. 2007). But contrary to the

Insurers' assertion here, Stein does not stand for the proposition that ancillary jurisdiction is

categorically unavailable whenever one of the parties in the ancillary action is not also a party to

the primary federal suit. To the contrary, Stein merely announces an additional inquiry—

presumably supplemental to the Kokkonen analysis—that the Court must make "when a non-

party to the primary proceeding is sought to be joined as a defendant in the ancillary

proceeding." 486 F.3d at 760-761. In such circumstances, in order to protect the interests of

the "non-party," Stein requires that "the need for the ancillary proceeding and the efficiencies

provided by it . . . be both sufficiently great to outweigh the prejudice to the non-party and to be

consistent with the limited jurisdiction of the federal courts." Id. at 761.[3]

---

[3] The result in Stein—reversal of the lower court's exercise of ancillary jurisdiction—clearly
rests on the unique and indeed unusual facts of that case. In Stein, employees of an accounting
firm were charged with federal tax evasion and related crimes. 486 F.3d at 756. Their employer,
a non-party to the action, had initially paid the employees' legal fees, but stopped payment
because the government threatened to bring charges against the employer if it continued to pay
the legal fees. Id. The district court found that by interfering with the payment of defense fees,
the government had violated the employees' constitutional rights. Id. The Court exercised
ancillary jurisdiction in order to remedy the constitutional violation: it *sua sponte* instructed the
clerk of the court to open a civil docket number so that the employees could pursue a claim
against their employer to compel payment of the defense costs. Id. at 757.

On appeal, the Stein Court found that exercising ancillary jurisdiction posed "clear" prejudice to
the employer because the employer had expected to resolve the claims through arbitration
proceedings as provided for in its employment agreements. Instead, the employer was "faced
with a federal trial of more than a dozen individuals' multi-million dollar 'implied-in-fact'
contract claims" which would "require the scrutinizing of decades of [the employer's] conduct,
determining the states of mind of dozens of individuals, applying the findings from those
inquiries to the particular circumstances of each [employee], and resolving multiple questions of
the law of several states." Id.

7

This supplemental Stein inquiry plainly supports the Court's decision to exercise ancillary jurisdiction over Li's coverage dispute. Although the Insurers are not parties to the criminal case, they are nevertheless not the kind of "non-parties" whose interests concerned the Stein court because *they already are parties before the Court*—indeed, they came of their own volition. In short, talk of non-party Stein-like prejudice is essentially a non-starter. To the extent a formal weighing of their interests against the "need for the ancillary proceeding" is required, the Court finds that the balance tips decidedly in favor of jurisdiction.[4] An ancillary proceeding is needed to foreclose undue delay in the resolution of the criminal proceedings and to ensure that this insurance dispute does not interfere with a fair and efficient trial for Li and his many co-defendants, while, as noted, the Insurers face no discernable prejudice.

II.    Insurers' Motion to Dismiss

Having assumed ancillary jurisdiction over Li's breach of contract claim, the Court next turns to the Insurers' motion to dismiss under the Policy's forum selection clause and on *forum non conveniens* grounds. Although the following discussion is protracted, the length of the discussion has no correlation to the worthiness of the Insurers' arguments in support of their motion. In almost haphazard fashion, the Insurers have launched a host of arguments to justify their refusal to pay. The Court is obligated to consider these arguments carefully and completely, and having done so, denies the Insurers' motion to dismiss.

---

Conversely, the Stein Court found that the need for the ancillary proceeding was "entirely speculative" because there was only a "marginal" interrelationship of factual issues underlying the proceedings, the ancillary proceeding would not necessarily cure the constitutional violation if the employees did not prevail, and "more direct and (and far less cumbersome) remedies" were available—that is, the district court could have dismissed the indictment or simply ordered the government to cease its conduct. Id. at 762-63.

[4] Throughout the decision, Judge Winters emphasizes the difference between the "common" exercises of ancillary jurisdiction—where "the parties to the ancillary proceeding are already before the Court"—and the inappropriate instance rejected in that case. 486 F.3d at 760.

A. *Forum Selection Clause*

The Insurers argue that that this action should be dismissed as a means of enforcing the Policy's forum selection clause, which provides, "For any disputes arising under this insurance relationship, a Swiss place of Jurisdiction and the application of Swiss Law shall be deemed to be agreed." Policy § 9; see Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex., 134 S. Ct. 568, 580 (2013) ("[T]he appropriate way to enforce a forum selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*."). "[I]n evaluating a motion to dismiss based on a forum selection clause, a district court typically relies on pleadings and affidavits, but must conduct an evidentiary hearing to resolve disputed factual questions in favor of the defendant." Martinez v. Bloomberg, 740 F.3d 211, 216-17 (2d Cir. 2014). The parties relying on affidavits, have not raised a material factual dispute, so no hearing is required.

On a motion to dismiss based on a forum selection clause, the court must determine "whether the claims and parties involved in the suit are subject to the forum selection clause." Martinez v. Bloomberg, 740 F.3d 211, 217 (2d Cir. 2014) (quotation and citation omitted). Where, as here, a contract contains a choice-of-law clause in addition to a forum selection clause, the court must apply the law designated in the choice-of-law clause to determine whether a party is subject to the forum selection clause. Id. at 224. Here, Li argues that he is not bound by the Policy's forum selection clause. Pl.'s Reply Br. 19; Oral Arg. Tr. 7. The parties agree that Swiss Law, as designated in the Policy, governs this issue. The parties disagree, however, as to which particular body of Swiss law applies.[5]

---

[5] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1.

9

1. Applicable body of Swiss law

Initially, the parties agreed that the Lugano Convention,[6] an international treaty setting forth rules of jurisdiction, is the applicable body of law because Switzerland is a contracting state to that treaty. Def.'s Br. 11; Pl.'s Reply Br. 15. They disagreed, however, as to which portion of the Lugano Convention applies to this dispute. The Insurers argued in their brief that the general provisions of the Lugano Convention regarding contracts (Article 23) apply, while Li, through an affidavit of Professor Ronald Brand, a professor of international and comparative law at the University of Pittsburgh, argued that the Lugano Convention's special rules regarding insurance contracts (Articles 8-14 under Section 3) apply. Def.'s Br. 11; Pl.'s Reply Br. 15; Brand Decl. ¶¶ 2, 14-20, ECF No. 24-7.

But after the Court heard oral argument, the Insurers changed course, arguing instead that the Lugano Convention is not applicable to this dispute. The Insurers submitted an affidavit from Dr. Hans Nigg, counsel for the Insurers and a former specialist judge on the Zurich Commercial Court, who contends that the Swiss Private International Law Act of December 18, 1987 ("PILA") and the Swiss Federal Law on Insurance Contracts (in German, Versicherungsvertragsgesetz, or "VVG") apply to this dispute because the Swiss Federal Tribunal "has not ruled on the scope of [the Lugano Convention's] application to an insurance contract purchased in Switzerland for the benefit of a third party not domiciled in a Member State." Nigg Decl. ¶¶ 11, 12, 19. Dr. Nigg, acknowledges, however, that if applicable, "international treaties such as the Lugano Convention take precedence over the PILA." Nigg Decl. ¶ 13.

---

[6] The official title of the Lugano Convention is the "Convention on jurisdiction and the enforcement of judgments in civil and commercial matters," executed at Lugano on September 16, 1988, and amended in 2007, Brand Decl. at 5, ECF No. 24-7, but it is hereafter referred to as the "Lugano Convention."

10

Li's expert, Professor Brand, on the other hand, counters that there is no sound basis for Dr. Nigg's assertion that the Lugano Convention is inapplicable in the absence of a ruling by the Swiss Federal Tribunal or in the United States. Brand. Supp. Decl. ¶¶ 7-8, ECF No. 29. First, Professor Brand points to a statement from the Swiss Federal Department of Foreign Affairs: "An international norm approved by Switzerland automatically becomes part of Swiss law. In the hierarchy of legal norms, in principle international law takes precedence over national law. The Federal Constitution requires the Confederation and the cantons to comply with international law." Id. at ¶ 8. Second, Professor Brand points out that Dr. Nigg has acknowledged that the Lugano convention takes precedence over the PILA, but has failed to explain why it should not follow that the Swiss Federal Tribunal would therefore apply the Lugano Convention over the PILA and the VVG. Id. at ¶¶ 5, 8.

The Court concludes that the Lugano Convention applies to this dispute because Switzerland is a contracting member of the Lugano Convention, and because both parties agree that under Swiss law, an international treaty takes precedence over national law. See Itar-Tass Russian News Agency v. Russian Kurier, Inc. 153 F3d 82, 92 (2d Cir. 1998) (In determining foreign law on the basis of expert testimony, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed."). Specifically, the Court concludes that Section 3 of the Lugano Convention applies to this dispute because that section covers the precise subject matter of this suit—"Jurisdiction in matters relating to insurance."

### 2. Li is not subject to the forum selection clause under applicable Swiss Law

Having determined that Section 3 of the Lugano Convention applies to the interpretation of the forum selection clause at issue here, the next step is to apply that law to determine whether "the claims and parties involved in th[is] suit are subject to the forum selection clause."

11

Martinez v. Bloomberg, 740 F.3d 211, 217 (2d Cir. 2014) (citation omitted).  Li argues that,

under Section 3 of the Lugano Convention and relevant case law, the forum selection clause does

not apply to him because he did not subscribe specifically to it.  Pl.'s Reply Br. 15.  Li relies

primarily on Societe Financiere et Industrielle du Peloux v. Axa Belgium, et al., ECJ Case No.

C-112/03, ECR I-307 (2005) (hereinafter "SFIP"), a case decided by the European Court of

Justice ("ECJ"), interpreting Article 12(3) of Brussels I Convention—the equivalent of Article

13 of Section 3 of the Lugano Convention.  There, the ECJ held that "[a] jurisdiction clause

conforming with Article 12(3) of the Brussels Convention cannot be relied on against a

beneficiary under that contract who has not expressly subscribed to that clause and is domiciled

in a Contracting State other than that of the policy holder and insurer."  SFIP at ¶ 43.

Li's expert, Professor Brand, explains that SFIP is applicable because, under Protocol 2

of the Lugano Convention, any court applying and interpreting the Lugano Convention must

"pay due account to the principles laid down by any relevant decision" rendered by the Court of

Justice of the European Union (formerly referred to as the European Court of Justice, or ECJ) in

interpreting the Brussels I Convention and Brussels I Regulation.  Lugano Convention, Protocol

2, art. 1, ¶ 1; Lugano Convention Title VI, art. 64 ¶ 1; see also Brand Decl. at ¶ 22).

The Insurers, however, argue that SFIP is not applicable to this dispute because the Swiss

Federal Tribunal has not yet decided whether and to what extent it would follow the SFIP

decision and because the SFIP decision was based on a former version of the Brussels

Convention.  Nigg Decl. ¶¶ 24-27.  But these arguments are without merit, as the Insurers do not

persuasively explain why the Swiss Federal Tribunal's express adoption of SFIP is a pre-

requisite to its application in this matter, or, in any event, why the Swiss Federal Tribunal would

choose not to follow that case in light of the explicit language in Protocol 2 of the Lugano

12

Convention, which clearly compels its application.  Further, as Li's expert persuasively points out, the former version of the Brussels Convention, upon which SFIP was based, is for the purposes of this case, identical in all material respects to the current version.  Brand Decl. ¶ 24.

The Insurers also argue that SFIP was expressly limited to protect only a beneficiary who is domiciled in a Member state, and therefore it cannot apply to this dispute because Li is not domiciled in a Member state.  Id. at ¶¶ 25-27.  This argument, however, is not persuasive.  See, e.g., Group Josie Reinsurance Company SA vs. Universal General Insurance Co., Case C-4128/98, ECR I-5940, I-5963 (2000) (holding that the jurisdictional rules of the Brussels I Convention, and by extension the Lugano Convention, "are applicable where the defendant has its domicile or seat in a Contracting State, even if the plaintiff is domiciled in a non-member country"); Baxter International Inc. v. AXA Versicherung AG, 908 F. Supp. 2d 920, 925 (N.D. Ill. 2012) (holding that, under SFIP, a non-signatory to an insurance contract, who was not domiciled in a Member state, was not bound by forum selection clause).  A review of the SFIP decision and other relevant case law cited by Li's expert, reveals that the protections of the Lugano Convention, as articulated in SFIP, would in fact apply with equal force to a non-signatory who is not domiciled in a Contracting state.

Finally, the Insurers argue that under the Swiss domestic insurance statute (the VVG) and related case law, Li is deemed to have constructively subscribed to the Policy when he made a claim under it.  Nigg Decl. at ¶ 25.  But, as discussed above, the Insurers have failed to explain why Swiss domestic law would supplant a relevant international treaty on this point.

For all the foregoing reasons, the Court concludes that under the Lugano Convention and SFIP, the forum selection clause contained in the Policy does not bind Li because he did not

subscribe to it.[7]  Accordingly, the Insurer's motion to dismiss under forum selection clause is denied.

### B. *Forum Non Conveniens*

The Insurers also move for dismissal under common law principles of *forum non conveniens*.  A district court has discretion to dismiss an action for *forum non conveniens* "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems."  Piper Aicraft Co. v. Reyno, 454 U.S. 235, 240 (1981) (internal quotation marks and citations omitted).

In making this determination, the court must consider private and public factors.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1981) (citation omitted).  The private factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."  Id.  The public factors include "administrative difficulties flowing from court congestion," the "local interest in having localized controversies decided at home," the interest in having a trial "in a forum that is at home with the law that must govern the action," and "the avoidance of unnecessary problems in conflict of law, or in the application of foreign law," as well as the "unfairness of burdening citizens in an unrelated forum with jury duty."  Id. (citation omitted).

---

[7] Defendants, citing United States law, argue that non-signatories are estopped from disclaiming obligations under a contract, such as a forum selection clause, while enjoying the direct benefits of that contract.  Def.'s Br. 13.  This argument, however, is foreclosed by the application of Swiss Law.

### 1. Deference

Although "[a] defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum," a plaintiff's choice of forum is entitled to less deference where, as here, "the plaintiff's choice is not its home forum." Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422, 430 (2007) (internal quotation marks and citation omitted). The Second Circuit, moreover, applies a "sliding scale" in determining a plaintiff's burden: "the more that a plaintiff, even a foreign plaintiff, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given to that choice." Bigio v. Coca-Cola Co., 448 F.3d 176, 179 (2d Cir. 2006) (citing Iragorri v. United Technologies Corp., 274 F.3d 65, 73 (2d Cir. 2001)). But, "even where the degree of deference is reduced, '[t]he action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable.'" Id. (citing Iragorri 274 F.3d at 74-75).

Li chose to sue in a court within this district for legitimate reasons. He is facing a criminal trial here, and, at the time he brought suit, he very likely expected to be restricted to this district, in one way or another, while awaiting trial. Moreover, at the time he brought suit, Li likely anticipated, based on the Insurers' representations, that the focus of the litigation would be on whether the charges brought against him in this district constituted a RICO suit for damages—a question that an American court would be well-suited to decide. Accordingly, I find that Li's choice to bring suit in this district was legitimate and otherwise appropriate, and is therefore entitled to deference.

### 2. Public and private factors

The Insurers argue that this Court is an inappropriate forum because "the plain language of the Policy at issue require[s] any dispute to be adjudicated in Switzerland under Swiss law,"

"all relevant witnesses and documents are in London and Switzerland," the Policy "was issued in Switzerland by Underwriters, who have offices in the United Kingdom and Switzerland," and FIFA, the party to whom the Policy was issued, is located in Switzerland. Def.'s Br. 10-11. Li responds that this forum is appropriate because it "already has a close relationship to the coverage dispute," and that Switzerland is not "an available alternate forum for the effective resolution of this dispute" because litigation there could last as long as three to four years. Frankhauser Decl. ¶¶ 3, 7-10, ECF No. 24-5; Pl.'s Reply Br. 20-21.

In this Court's view, on balance, the private and public factors do not support dismissal for *forum non conveniens*. While there may be relevant witnesses and documents elsewhere, there are relevant witnesses and documents already in this forum as well, including Li, his co-defendants, prosecutors, and a copy of the contract at issue. While the Insurers may face some inconvenience in litigating here, they have not presented evidence showing such a situation to be "oppressive or vexatious." It would, by contrast, be far more inconvenient for Li to litigate this action in Swiss Court while he is restricted within this district awaiting or undergoing trial. Although the contract at issue calls for the application of Swiss law, the underlying factual issues, as discussed above, will be thoroughly aired in this Court where volumes of potentially relevant information are being produced during discovery in the related criminal action. Inevitably, it will be far more efficient and convenient for both parties for this Court to apply Swiss law, than for a Swiss court to relitigate factual issues already resolved in this Court.

Further, it simply must not be overlooked that compelling practical considerations counsel against dismissal. Li faces serious charges and the possible consequences for him are indeed grave. The stability of the attorney client relationship during this critical time cannot be overstated. The strong local interest in seeing that litigants before this Court are appropriately

represented, officers are appropriately compensated, and that criminal matters are not unnecessarily hindered cannot be ignored.  There are insufficient grounds to dismiss for *forum non-conveniens* and the motion is accordingly denied.[8]

III.     Li's Motion for a Preliminary Injunction

Li moves for a preliminary injunction requiring the Insurers to pay his legal costs as contemplated by the Policy.  To obtain a preliminary injunction, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."  Christian Louboutin S.A. v. Yves Saint Laurent America Holdings, Inc., 696 F.3d 206, 215 (2012) (citation omitted).

If the moving party seeks an injunction that will "alter the status quo by commanding some positive act," then the movant is held to a heightened standard: an injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011).  Where an injunction will require a party to do what it "should have done earlier," however, the heightened standard does not apply.  Johnson v. Kay, 860 F.2d 529, 541 (2d Cir. 1988).  In In re WorldCom, Inc. Securities Litigation, 354 F.Supp. 2d 455, 463 (S.D.N.Y. 2005), for example, a plaintiff sought an injunction requiring a

---

[8] The Court notes that underwriters at Lloyd's London have appeared in this district a number of times, and, moreover, have done so as plaintiffs in recent cases.  See, e.g., Certain Underwriters at Lloyd's London v. National Railroad Passenger Corporation, No. 14-cv-4717 (FB), 2016 WL 739061 (Feb. 19, 2016 E.D.N.Y.); Certain Underwriters at Lloyd's London v. National Railroad Passenger Corporation, No. 14-cv-4717 (FB), 2015 WL 1182764 (Mar. 13, 2015 E.D.N.Y.); Certain Underwriters at Lloyd's London v. Art Crating, Inc., No. 12-cv-5078, 2014 WL 123488 (Jan. 10, 2014 E.D.N.Y.).  This is hardly an alien forum for affiliates of Lloyd's London or their attorneys.

defendant to advance litigation expenses under an insurance policy.  Id.  The WorldCom court

declined to apply the heightened standard because "the policy language strongly supports

[plaintiff's] argument that [defendant] should already have been advancing defense costs, and the

injunction will not substantially interfere with [defendant's] right to obtain a meaningful remedy

if it prevails on the merits" since the defendant will have "the right to recoup the defense costs."

Id.  Here, as in WorldCom, Li seeks a preliminary injunction requiring the Insurers to advance

legal fees as they allegedly should have done earlier under the terms of the Policy, and the

Insurers have the right to recoup those payments if successful on the merits.  Accordingly, the

heightened standard does not apply to Li's motion for a preliminary injunction.

A. *Irreparable Harm*

"Irreparable harm is the single most important prerequisite for the issuance of a

preliminary injunction."  Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d

Cir. 1998) (quotation marks and citation omitted).  "To establish irreparable harm, a party

seeking preliminary injunctive relief must show that there is a continuing harm which cannot be

adequately redressed by final relief on the merits and for which money damages cannot provide

adequate compensation," and that the harm is "actual and imminent, not remote or speculative."

Kamerling v. Massanari, 295 F.3d 206, 212 (2d Cir. 2002) (quotation marks omitted).  Two

courts in the Southern District of New York have held that "[t]he failure to receive defense costs

under a professional liability policy at the time they are incurred constitutes an immediate and

direct injury sufficient to satisfy the irreparable harm requirement."  XL Specialty Insurance Co.

v. Level Global Investors, L.P., 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) (citing WorldCom,

354 F. Supp. 2d at 469).

18

In <u>WorldCom</u>, where an insurer refused to advance any defense costs to the insured prior to trial, the court explained:

> It is impossible to predict or quantify the impact on a litigant of a failure to have adequate representation at this critical stage of litigation. The ability to mount a successful defense requires competent and diligent representation. The impact of an adverse judgment will have ramifications beyond the money that will necessarily be involved. There is the damage to reputation, the stress of litigation, and the risk of financial ruin—each of which is an intangible but very real burden.

<u>In re World Com, Inc., Securities Litigation</u>, 354 F. Supp. 2d 455, 463, 469 (S.D.N.Y. 2005).

Similarly, in <u>XL Specialty Ins. Co. v. Level Global Investors, L.P.</u>, 874 F. Supp. 2d 263 (S.D.N.Y. 2012), the court granted a preliminary injunction where an insurer had initially paid the insureds' criminal defense costs but ceased payment prior to trial. The court found that if the insurer was "not directed to resume paying [the] costs [of the insureds' criminal defense], the insureds are likely to suffer 'extreme or very serious damage,' the highest of the standards the Second Circuit uses to measure irreparable harm." <u>Id.</u> at 272

When Li commenced this suit, he was receiving some coverage of his defense costs under the Federal Policy. At that time, the Insurers argued that Li could not establish irreparable harm because he had other funds available under the Federal Policy. The Federal Policy, however, has since been exhausted and therefore it is not necessary for the Court to entertain this argument. Rosenthal Decl. ¶ 4, ECF No. 32. Because the Insurers have refused to advance any defense costs to Li as he has incurred them, and prior to his trial, Li faces an actual and imminent injury and has established irreparable harm.

B. *Success on the Merits*

Li has established a clear and substantial likelihood of success on the merits. The Policy provides broad coverage to an insured for defense, investigation, and extradition costs. Under

generous terms, section 1.1 of the Policy provides an insured with "world-wide" coverage for "defence costs incurred to defend any actual or alleged wrongful acts." Policy § 1.1. The Policy further provides in section 3.10, "Should the question of any wrongful intent be at issue, cover shall be granted for the defence costs." Policy § 3.10. In addition, the Policy provides an insured with coverage for "Investigation costs," which include costs arising from "any formal hearing, examination or inquiry by an official body into the affairs of a company or outside entity, or an Insured Person of such entity." Policy § 1.1. The obligation to pay "Investigative costs" is triggered when an insured person "is identified in writing by an investigating official body as a target of the hearing, examination or inquiry." Id. In addition, section 1.10, "Extradition Costs Extension," provides coverage for "the reasonable legal fees, cost, and expenses, incurred by an insured person" arising out of extradition proceedings. Policy § 1.10.

Li has made a clear showing that the Insurers are required to pay the legal costs of his defense, investigation, and extradition. First, Li is "alleged" to have committed "wrongful acts" in the indictment returned in United States v. Webb, thereby obligating the Insurers to pay his "defence costs" under the Policy. Second, the indictment has "identified [Li] in writing . . . as a target" of an "inquiry" and a "hearing" by "an official body," thus triggering the Insurers' obligation to pay his "Investigative costs." Third, Li incurred legal fees in connection with his extradition from Switzerland to the United States, thereby triggering the Insurers' obligation to pay those fees under the "Extradition Costs Extension" provision of the Policy.

It is equally clear that the Insurers have an obligation to pay Li's legal costs at the time they are incurred and on an ongoing basis. That the Policy mandates such contemporaneous payments is evident in section 3.1, which provides, "Should the question of any wrongful intent be at issue, cover shall be granted for the defence costs" but an insured person "found guilty of

wrongful intent . . . will be obliged to reimburse the Insurer for all payments made on his or her behalf." Policy § 3.1. Clearly, there would be no need to reimburse the insurer if contemporaneous payments were not required under the Policy.

While Li has pointed to expansive language entitling him to coverage under the Policy, the Insurers ask the court to interpret certain ambiguous provisions of the Policy as setting forth qualifications and limitations—interpretations that the Court finds to be strained and unconvincing. First, the Insurers argue that under the Policy, the "defense costs payable in criminal matters are limited to 'investigative proceedings'" and that the indictment and prosecution of Li do not constitute "investigative proceedings." Def.'s Br. 19. While such a limitation is hardly apparent from the language of the contract, even if the Policy were limited only to costs associated with investigations, the Policy, by its own terms, broadly defines "investigation" to include "any formal hearing," which presumably encompasses an indictment and criminal trial. Policy §§ 1.1, 2.4.

Moreover, that the government filed a superseding indictment on November 25, 2015, after this action commenced, adding charges against Li, shows that there is in fact an ongoing investigation, thus warranting immediate, contemporaneous payment of Li's legal fees. Indeed, on December 3, 2015, shortly after the indictment was issued, the Federal Bureau of Investigation stated in a press release that "[t]his indictment is the latest step in that effort, but our work is not done. While our investigation continues at home, we also look forward to continuing our collaboration with our international partners, including in particular the Swiss authorities, because there is so much yet to be done." ECF No. 24-4. And as recently as April 11, 2016, the government stated in a court filing in United States v. Webb, that "the

government's investigation is ongoing."  Government's Letter Providing Case Update, ECF No. 304.  Accordingly, the Insurers' denial of coverage on this basis is unavailing.

Next, the Insurers argue that Li is not entitled to defense costs because he does not qualify as an "Insured person" since he never acted in a "managerial or supervisory capacity."  Def.'s Br. 20.  But it is undisputed that Li was a FIFA standing committee member, and section 1.3 of the Policy provides, "For the avoidance of doubt, the definition of Insured Person extends to include Chairmen and executives and any person acting in a comparable function / capacity of any FIFA Commission, standing or ad-hoc committee."  This provision does not limit coverage to only those standing committee members who acted in a managerial or supervisory capacity, and, thus, the Insurers' denial of coverage on this basis is similarly baseless.

The Insurers also argue that Li is not entitled to relief because the "factual allegations of the Indictment make[] readily clear that the claims against Li have nothing to do with his association with FIFA" and because he acted for his own "personal gain."  Def.'s Br. 4, 21.  But, belying the Insurers' assertion, the indictment alleges that "[a]t various times relevant to the Indictment," Li "served on multiple FIFA standing committees."  United States v. Webb, 15-CR-252, ECF No. 1 at 113.  Moreover, the Insurers do not specify a relevant provision of the contract or applicable law warranting a denial of coverage on these grounds.

Of note, the Insurers have abandoned their initial, and meritless, ground for denial of coverage—a ground which the Insurers initially characterized as "the most important" in their August 13, 2015, letter denying coverage—under the Policy's "RICO exclusion," which excludes from coverage "claims for damages" based on the RICO Act.  Oral Arg. Tr. 25; Policy § 3.3.2.

For the foregoing reasons, I conclude that Li has established a likelihood of success on the merits.

C. *Balance of Hardships*

The hardships tip decidedly in Li's favor. If no injunction is issued, Li will never receive the benefit of his bargain, likely be deprived of his chosen counsel at this critical time, and sustain a conviction he might otherwise have avoided, while the Insurers, in any event, are relieved of their obligation to advance funds pending a final resolution. If, on the other hand, an injunction is issued, the Insurers face only monetary loss which may be recouped as provided in the Policy.

In sum, because Li has shown that he faces irreparable harm, that he is likely to succeed on the merits, and that the hardships tip in his favor, Li's motion for a preliminary injunction is granted.

## CONCLUSION

For the foregoing reasons, the Insurers' motion to dismiss is denied and Li's motion for a preliminary injunction is granted. The Insurers are ordered to immediately reimburse and advance to Li his legal costs incurred in connection with his indictment, extradition, and defense in United States v. Webb, 15-CR-252.

SO ORDERED.

Dated: Brooklyn, New York
      April 27, 2016

s/ RJD

RAYMOND J. DEARIE
United States District Judge

23