UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
JULIO ROCHA,                      :    16cv02327(RJD)
                                  :
        Plaintiff,                :
                                  :
    -against-                     :    United States Courthouse
                                  :    Brooklyn, New York
                                  :
                                  :
CERTAIN UNDERWRITERS AT           :
LLOYD'S, AXIS SPECIALTY           :    Tuesday, June 21, 2016
EUROPE SE,                        :    12:00 p.m.
                                  :
        Defendants.               :
                                  :
                                  :
- - - - - - - - - - - - - - - - X

        TRANSCRIPT OF CIVIL CAUSE FOR ORDER TO SHOW CAUSE
           BEFORE THE HONORABLE RAYMOND J. DEARIE
           UNITED STATES SENIOR DISTRICT COURT JUDGE

                    A P P E A R A N C E S:

For the Plaintiff:      PILLSBURY WINTHROP SHAW PITTMAN
                        Attorneys for the Plaintiff -
                        JULIO ROCHA
                            1540 Broadway
                            New York, New York 10036-4039
                        BY: ALEXANDER D. HARDIMAN, ESQ.


                        PILLSBURY WINTHROP SHAW PITTMAN
                        Attorneys for the Plaintiff
                            1200 Seventeenth Street, NW
                            Washington, DC 20036-3006
                        BY:  WILLIAM SULLIVAN, ESQ.

                        PILLSBURY WINTHROP SHAW PITTMAN
                        Attorneys for the Plaintiff
                            1200 Seventeenth Street, NW
                            Washington, DC 20036-3006
                        BY:  THOMAS HILL, ESQ.

 For the Defendants:      CLYDE & CO. US LLP
                          Attorneys for the Defendants -
                          CERTAIN UNDERWRITERS AT LLOYD'S, AXIS
                          SPECIALTY EUROPE SE
                              The Chrysler Building
                              405 Lexington Avenue
                              New York, New York 10174
                          BY: MICHAEL KNOERZER, ESQ.


Court Reporter:   Court Reporter:  Michele D. Lucchese, RPR
                  Official Court Reporter
                  Telephone: (718) 613-2272
                  Facsimile: (718) 804-2719
                  E-mail: michsassy21@ymail.com


Proceedings recorded by computerized stenography.  Transcript
 produced by Computer-aided Transcription.

1        (In open court.)

2        THE COURTROOM DEPUTY:  We are on this morning for

3   an Order to Show Cause.  This is Rocha versus Certain

4   Underwriters at Lloyd's, Docket No. 16-2327, assigned to

5   Judge Dearie and Magistrate Judge Levy.

6        Can I ask the attorneys to please note their

7   appearance, beginning with counsel for Plaintiff.

8        MR. HARDIMAN:  Good morning.  Alexander Hardiman of

9   Pillsbury Winthrop Shaw Pittman for Plaintiff, Julio Rocha.

10  I'm joined today by Mr. William Sullivan, also of the

11  Pillsbury firm, who is criminal counsel for Mr. Rocha, and

12  Thomas Hill, also criminal counsel for Mr. Rocha.

13       MR. HILL:  Good morning, Your Honor.

14       MR. SULLIVAN:  Good morning, Your Honor.

15       THE COURT:  Good morning, gentlemen.

16       MR. KNOERZER:  Michael Knoerzer for the Defendant,

17  Certain Underwriters at Lloyd's and Axis.  I am with the firm

18  of Clyde & Co.  With me today are Simone Bonnet, newly

19  admitted to this court today, and Scott Schwartz.

20       MS. BONNET:  Good morning.

21       THE COURT:  Welcome all.  If you do not mind a

22  little ribbing, if somebody is worried about attorneys'

23  costs:  Two partners from Pillsbury here, including two from

24  D.C.  Just a little friendly ribbing.

25       MR. SULLIVAN:  It is a recently superseding

1    indictment, Your Honor, a very complex matter.

2            THE COURT:  Well, I will tell you, to tackle the

3    definition of insured person, you need a slide rule and a

4    bottle of aspirin and a lot of time, but we will get to that

5    in a minute.

6            We have, of course, an application for

7    preliminary injunction.  We also have, from Clyde & Co,

8    pending a request to file a motion to dismiss, I assume on

9    grounds similarly to those expressed, as you said, in your

10   letter in the context of this application.

11           MR. KNOERZER:  Yes, your Honor.

12           THE COURT:  The practical problem I had with that,

13   of course, is by rule I have to deal with a request for

14   equitable relief expeditiously, and I will do that.  To the

15   extent that motion practice impacts that, we will just take

16   it as we see it and plan accordingly.  Does that make sense?

17           MR. KNOERZER:  Your Honor, I have been asked that

18   question by judges many times before and I have always said

19   yes and I won't change my practice.

20           THE COURT:  Even though you think no, you say yes?

21           MR. KNOERZER:  I believe that it makes sense.

22           THE COURT:  Where shall we begin, gentlemen?  A

23   couple of questions, first of all.  Irreparable harm, I just

24   want to jump to that for a moment.  Is there anything in the

25   application -- I don't see it -- about Mr. Rocha's personal

1    finances?

2           MR. HARDIMAN:  No, Your Honor.  There is nothing in

3    the current application about Mr. Rocha's current finances.

4    Although, I would say for the purposes of the Court, the

5    court record on the bail hearing, I believe, established that

6    for the purposes of bail, Mr. Rocha had to rely on an

7    extensive network of family and friends and friends of

8    friends and we can make a representation to the Court that

9    his personal assets are not sufficient to --

10          THE COURT:  As far as you know.

11          MR. HARDIMAN:  As far as we know.  Should the Court

12   wish additional information or a statement from Mr. Rocha

13   regarding his personal assets, then we can certainly provide

14   the Court with that in very quick order.

15          I would like also point out, unlike his

16   co-defendants, Mr. Rocha does not own any property.  This is

17   also, I think, established to a large extent in the criminal

18   proceedings, and he was unable to put up any property to

19   secure his bail bond.

20          THE COURT:  When you say the co-defendant, are you

21   referring to Mr. Li?

22          MR. HARDIMAN:  Mr. Li and others.

23          I believe many of them had properties in stark

24   contrast to Mr. Rocha.  So what we are dealing with here is

25   someone who cannot afford the kind of complex defense that

1  this is going to require and that the policy is designed to

2  pay for.  But should the Court wish further information on

3  that, on his financial wherewithal or lack thereof, we can

4  certainly get it to the Court.

5        THE COURT:  It is certainly germane to the

6  discussion, is it not?

7        MR. HARDIMAN:  I actually don't think it is germane

8  to the discussion, Your Honor, because the insurance policy

9  is designed to advance defense costs.

10        THE COURT:  I understand your argument.

11        Now, how about other sources?  There is no

12  other coverage?  There is nothing?

13        MR. HARDIMAN:  As a preliminary matter, we don't

14  believe that that is a relevant question before the Court as

15  set forth in our papers.

16        I can tell the Court that CONCACAF has

17  rejected his request for indemnification and request for

18  insurance.  They have represented that he is not insured

19  under their policy by virtue of having not been an official

20  of CONCACAF, according to them.

21        UNCAF, which is a sub-federation, I believe,

22  also has written back and stated that they do not maintain

23  any directors and officers insurance and that he is not

24  entitled to indemnification from the organization itself.

25        FENIFUT, the other potentially implicated

1   organization, also has simply not responded.  We will be

2   following up on that.  But we have no information indicating

3   that there is any available other insurance that covered for

4   Mr. Rocha at this point.  So the only policy and the policy

5   designed to respond is the FIFA policy.

6          THE COURT:  So he and you are really on the rope?

7          MR. HARDIMAN:  Yes, your Honor.  Again, that's why

8   we are here for a preliminary injunction.  We wish we

9   weren't.  We thought that the Li decision was pretty clear,

10  certainly on the jurisdictional questions.

11          On the forum non conveniens rulings, those are

12  legal rulings which are binding in this case as a related

13  case, yet defendants are still arguing about this.  They

14  won't even accept service.  Their attorneys are here and they

15  won't even accept service.  I understand they may be entitled

16  to do so, but I think that's a sign of what we are dealing

17  with in terms of the kind of good faith obligations that they

18  have under the insurance policy.

19          THE COURT:  I thought that under the terms of the

20  -- I was about to use the word convention, you can serve in

21  the manner that you served, by e-mail and so forth.

22          MR. HARDIMAN:  That's what we have laid out in our

23  papers, but, apparently, defendants disagree and are

24  disputing.  I mean, we have served in the manner prescribed

25  by the policy, in the manner we believe is permitted under

1   the convention.  We also have served the New York Department

2   of Insurance through the Insurance Law 1213, I believe it is,

3   which permits us to serve them as a foreign insured doing

4   business in New York State.

5                   We can spend time talking about service

6   eventually.  Even if we are wrong, which we are not, they are

7   going to get served one way or another.

8               THE COURT:  Let me switch gears here for a second

9   and go to step one, which, of course, is jurisdiction.  And

10  you all know that I have been heard to some extent on this in

11  a related case, not an identical case, but a related case.

12  What I don't understand from the defense, the insurer, is the

13  position there is no common nucleus effect when the very

14  problem of who is the insured person involves facts that are

15  going to be on the table in the course of this criminal case

16  and, indeed, the superseding indictment alleges facts such as

17  Mr. Rocha's employment by FIFA and so forth, as well as the

18  question I dealt with before, and that is the whole RICO

19  business, all tied in to the criminal case.  I wonder if you

20  might speak to that for a second.

21                  The last thing in the world I want to do -- I

22  would like to do this somewhat informally.  I will not cut

23  you off.  I will give you all the time you need to address

24  whatever you want to address, but I don't want to be involved

25  in resolving insurance disputes, and my colleagues will never

1   speak to me again and the Second Circuit will probably smack

2   me around.  I thought this was a very unusual situation, as I

3   laid out, that does threaten the timely resolution of very

4   serious criminal charges.  But in this unusual case it seems

5   to me that they are tied in, not only on the issue of

6   coverage twice, at least twice, is he an insured person and

7   is the RICO exclusion in any way applicable in this case,

8   facts that will have to be resolved during the course of the

9   criminal trial.  Am I off base?

10          MR. KNOERZER:  Yes, Your Honor, with respect, I

11  believe that you are.  I believe in part, part of the problem

12  is that there has never been a clear enunciation to the Court

13  on what the standards are required for ancillary

14  jurisdiction.

15          I believe that the Courts or the defendant's

16  inconvenience, the criminal defendant's inconvenience is far

17  down the road in the things that you have to consider.  There

18  is a threshold issue, and that is that the two claims that

19  are going to be bound together by ancillary jurisdiction have

20  to derive from a common nucleus of operative facts.  If you

21  looked at the Kokkonen decision that Your Honor decided in

22  Li, the Court laid out the goals of ancillary jurisdiction

23  but not those requirements.  But in that case, Your Honor,

24  there were two claims, and I think that case is, frankly,

25  very instructive.  There was a claim for breach of an agency

1   agreement and that action was in Federal Court.  The matter

2   was settled, and then there was an action on the settlement

3   agreement related to the breach of the agency agreement

4   action.  What Judge Scalia said, writing for the Supreme

5   Court, is that the facts underlying the respondent's

6   dismissed claim for breach of an agency agreement and those

7   underlying its claim for breach of settlement agreement have

8   nothing to do with each other.  It would neither be necessary

9   or either particularly efficient that they be adjudicated

10  together.

11              THE COURT:  How do we say that about this case,

12  have nothing to do with each other?

13              MR. KNOERZER:  The resolution of the insurance

14  issues in no way will advance the criminal prosecution or the

15  defense of Mr. Rocha.  There is nothing in the -- Your Honor,

16  the Court has been thinking about the money and how the money

17  will help the man defend himself, but that's not a criteria

18  for ancillary jurisdiction.  What is a criteria for ancillary

19  jurisdiction is whether the two matters are interdependent

20  and not just related, interdependent.  And there is nothing

21  that will happen in the coverage action for the insurance

22  case that will in any way assist Mr. Rocha's defense, not a

23  thing.  That's the way this needs to be looked at because

24  that's the way ancillary jurisdiction works.

25              THE COURT:  Where are you getting this from?

1          MR. KNOERZER:  It comes from all the case law, Your

2   Honor.

3          THE COURT:  Particularly the word interdependent.

4          MR. KNOERZER:  That is from the United States

5   Supreme Court decision in Kokkonen versus Guardian Life.  It

6   was cited by you, Your Honor, in the Li case.  It is 511 U.S.

7   375, factually interdependent.

8          THE COURT:  Factually interdependent.  So

9   factually, the coverage question here depends upon the

10  resolution of facts that are charged as part of criminal

11  indictment; yes?

12         MR. KNOERZER:  I don't know enough about the

13  criminal indictment to say, Your Honor.  I don't know that

14  anybody can predict that going forward.

15         THE COURT:  You don't know enough about the criminal --

16         MR. KNOERZER:  Your Honor, what I do know is that

17  the analysis is is there anything that needs to be decided in

18  the coverage action that is helpful to the defense action,

19  and there is nothing.  That's the way this has to be looked

20  at.  The question is, is there something so important in the

21  insurance coverage action that is going to be decided there

22  that it has to be brought into the criminal action because it

23  is -- because the criminal action needs the resolution of

24  these other things to be a hole, and there is nothing

25  factually related or interdependent about -- I should just

1    say factually interdependent about them.

2         THE COURT:  So your view is the coverage case

3    should go its own way, presumably in Switzerland, and we

4    should leave hanging the question of Mr. Rocha's

5    representation, compensation and so forth?

6         MR. KNOERZER:  Yes, your Honor, because the Court

7    does not have jurisdiction over it.

8              Issues of convenience or things like that

9    don't weigh in unless you can get past the threshold issue.

10   What we don't have is a common nucleus of operative facts

11   between the cases.  I understand what the court is saying

12   about how it would be helpful to understand what hat Mr.

13   Rocha was wearing in both cases, but that does not make them

14   factually interdependent, as the United States Supreme Court

15   has said.  And the convenience of the witnesses in the United

16   States -- the convenience of Mr. Rocha, as the United States

17   Supreme Court has said in Kroger, is of a secondary

18   consideration.

19             There's also, Your Honor, the other matter.

20        THE COURT:  I think you would concede it is a

21   little bit more than convenience?

22        MR. KNOERZER:  Your questions at the start of this

23   hearing, Your Honor, suggested that there is an open issue as

24   respects Mr. Rocha about this.  What I would say is this,

25   Your Honor, you will note FIFA is not here.  FIFA is not here

1   yelling that this man is an employee and is entitled to

2   coverage.  FIFA has a policy that says it has a Swiss

3   jurisdiction.  I think it is a matter of record that people

4   have made claims under the policy.  This isn't an instance of

5   an insurer trying to duck payment.  What we are looking for

6   is an orderly forum for the payments to be distributed

7   because if we pay out more money to people who aren't

8   actually covered, then we have a problem as an insurer.  We

9   have a duty to FIFA.  So I understand Mr. Rocha's dilemma as

10  he is stating it, that he may not have enough money to bring

11  his defense, but there are other issues involved.  It

12  appears, as we have just learned, that underwriters on the

13  FIFA policy aren't the only insurers who have turned this man

14  down.

15          THE COURT:  Are you suggesting that you are in the

16  nature of a stakeholder?

17          MR. KNOERZER:  Well, it is an interesting question,

18  Your Honor, because we cannot, as our research suggests,

19  because of the way that we have been put into this court on

20  ancillary jurisdiction, our preliminary research suggests we

21  could not be a stakeholder, we cannot interplead funds

22  because it's ancillary jurisdiction.  That's one of the many

23  problems that this particular circumstance creates for us.

24          THE COURT:  Speak to that.

25          MR. HARDIMAN:  Your Honor, with respect to whether

1   they can deposit with the Court an interpleader action, the

2   Court wishes me to address that?

3              I have not researched the issue, but based on

4   my experience with interpleaders, I see no reason why the

5   defendants couldn't simply institute an interpleader action

6   in this court.  There is absolutely no reason for them -- if

7   they want jurisdiction in this court, just as when they

8   removed from State Court and asserted that this Court had

9   jurisdiction in the first instance in the Li action, they

10  could do so now, and they can do so pursuant to ancillary

11  jurisdiction.

12         THE COURT:  It is a bit of a sticky wicket with

13  them.  If they pay, for example, Mr. Rocha and FIFA says, in

14  effect, what are you doing?  You are taking our protection

15  and giving it to somebody who didn't contract for it, so you

16  have just increased the value of our policy, or you have

17  increased the potential obligation of the insurer.

18         MR. HARDIMAN:  No, Your Honor, it doesn't concern

19  FIFA.  Mr. Rocha is an insured under this policy and we are

20  entitled -- he is entitled to payments under this policy.  I

21  would like to also point out that they denied coverage.

22         THE COURT:  Of course.

23         MR. HARDIMAN:  This question of oh, we have got

24  competing claims, we are not even there yet.

25         THE COURT:  I understand.

1    MR. HARDIMAN:  So I don't think it's a relevant
2  inquiry.
3          As to Mr. Rocha's status and competing claims,
4  he is an insured under the policy, he's entitled to payments
5  under the policy.  What the insurers do with respect to other
6  claimants is their issue; it's not Mr. Rocha's issue.
7    THE COURT:  Interesting.  It's an interesting -- by
8  no means I'm not an expert, far from it, on insurance law.
9  The carrier has obligated itself up to a certain level and
10  they are multiple claims coming in against that fund, if you
11  will.  What does a carrier do?  I don't know.
12    MR. HARDIMAN:  Your Honor, this happens every day
13  in every D & O case, and the rule generally is first in time.
14    THE COURT:  Really?
15    MR. HARDIMAN:  First in time.  Do they pay out the
16  claims --
17    THE COURT:  First come, first serve.
18    MR. HARDIMAN:  First come, first serve.
19    THE COURT:  When it is depleted, it is gone.
20    MR. HARDIMAN:  And when it's depleted, it's gone.
21          It's not first come, first serve to the
22  exclusion of other insurers; it is as the bills come in, they
23  get paid.  And as bills from other claimants come in, those
24  also get paid until it's depleted.  That's the way D & O
25  insurance works.  This is not an unusual situation.

1          THE COURT:  You have to protect yourself, I'm sure

2    there is language to that effect in the policy.

3          MR. KNOERZER:  The language -- and I do want to

4    come back briefly to subject matter jurisdiction, Your Honor,

5    but let me address your question.  The language in the policy

6    that's protective on this is the insured person's language

7    and we believe that they have not met their burden of

8    establishing that they are an insured person.

9                 Before I address that, Your Honor, may I

10   address one more thing on subject matter jurisdiction?

11         THE COURT:  The insured person is the principal

12   basis for the declination of coverage?

13         MR. KNOERZER:  Yes, your Honor.  I would freely

14   admit that if we have to start getting into the weeds about

15   what this fellow is alleged to have done when, it gets more

16   problematic on this particular preliminary injunction.  We

17   are not set up for that.

18                 I believe that based on the allegations it is

19   very difficult for Mr. Rocha to argue that in any way he's

20   being accused of doing anything when he had any role with

21   FIFA.  But what is more important, I believe, is the man

22   can't get past the front door on the policy because he cannot

23   establish that he is an insured person.  The agreement that

24   he signed with FIFA is called a development officer

25   agreement.  It is in the papers.

1          THE COURT:  I have read it.  I understand your

2   point on that.

3          MR. KNOERZER:  Okay.

4          Just for this transcript, paragraph 14 says nothing

5   in the agreement shall establish an employment, relationship,

6   and the allegations and the thrust of the arguments to you,

7   Your Honor, have been that this man is an employee of FIFA.

8   He is not an employee of FIFA.

9          THE COURT:  Wish it were that simple.

10         MR. KNOERZER:  Well, there is nothing else under

11   the policy that they can argue.  He's not the president of

12   FIFA.  He is not a vice president of FIFA.  He is not a

13   member of FIFA.  He doesn't have any role with FIFA that

14   makes him -- their original thrust was he's an employee of

15   FIFA.  That's what they alleged in Mr. Rocha's affidavit.

16   Mr. Rocha apparently hadn't read his development officer's

17   agreement, which says he is not an employee of FIFA.  So,

18   since then, they have alleged, but they do not have any

19   support, that he is all these potentially other things.  But

20   we believe that when you look at the FIFA documents, as well

21   as the FIFA witness statement, that it is very clear that

22   FIFA is a separate organization from FENIFUT, which is what

23   this man was a part of; the same entity that has refused him

24   coverage.  He was the president of FENIFUT and we hear that

25   FENIFUT has refused him coverage.  He was never the president

1   or anything remotely like it for FIFA.  It seems strange to

2   us that the former president of FENIFUT wouldn't get coverage

3   from them, but this man not even an employee of FIFA would

4   get coverage from FIFA.

5          THE COURT:  I don't know what FENIFUT's

6   arrangements were, so it is hard to read too much into that.

7              Mr. Hardiman, I have read this definition, 1.3

8   definition, gosh, any number of times.  I can't say that I am

9   any clearer on it.  What is the strongest argument you can

10  make under 1.3 for Mr. Rocha as an insured person?

11         MR. HARDIMAN:  Your Honor, we respectfully disagree

12  with respect to the employee status.

13         THE COURT:  The agreement says what it says, does

14  not create employment relationship.

15         MR. HARDIMAN:  It says what it says, but in the

16  FIFA -- FIFA filed a restitution complaint in the criminal

17  action alleging he was a FIFA official, that they were

18  entitled to his salary back based on being employed as a --

19  as FIFA development officer.  So there, you don't need to

20  look to a documentary agreement.  There, you have his

21  employer seeking restitution of his salary based on his

22  status as head development officer.

23         THE COURT:  Was he paid a salary?

24         MR. HARDIMAN:  He was paid a salary.  According to

25  this, it was I think $7,000 a month for a year.  They are

1    seeking back close to $400,000 in what they specifically call

2    salary and bonuses and other compensation.  So I think right

3    there is enough to demonstrate that he was -- they considered

4    him to be a de facto employee.

5              Now, even if that weren't the case, left

6    unaddressed by defendants in their papers and here today is

7    the catchall broad provision in 1.3 that says Coverage is

8    provided to a general agent or representative of FIFA.  Now,

9    even defendants can't argue that he was not a general agent

10   or representative of FIFA.  He was paid to be FIFA's head

11   development officer for Latin America, and there is simply no

12   argument on that.  That is reflected in the employment

13   agreement which they have hung their hat on with respect to

14   the employee/employer status.  It says This agreement does

15   only authorize and entitle the DO, Mr. Rocha, to act as a

16   representative of FIFA in any de facto dejure capacity upon

17   instructions.  Put that together with Mr. Rocha's affidavit,

18   which is unrebutted, there is no affidavit from FIFA, if FIFA

19   was so concerned about this matter, all the insurers had to

20   do was call them up and say we saw that you filed a Complaint

21   for restitution from Mr. Rocha as your employee, but we'd

22   like you to submit an affidavit because apparently defendants

23   belief their interests are implicated, FIFA's.  That was

24   their argument earlier.  Why not have them submit an

25   affidavit?  They didn't.  It is unrebutted at this stage.

1  There is simply no argument on the representative and general

2  agent capacity in Section 1.3, in addition to the other

3  capacities that we have laid out.

4          THE COURT:  Let's go back to jurisdiction.  I'd

5  like to hear from you on that.

6          MR. HARDIMAN:  Yes.  Well, as a preliminary matter,

7  Your Honor, I don't think we should be hearing arguments

8  about jurisdiction.  This is a rehash of a ruling that's

9  already been made.  That is binding in this case, is our

10  position.

11          THE COURT:  Not so fast.  There are some

12  differences between this and Mr. Li's situation, not the

13  least of which is, of course, the carrier came running in

14  here to Federal Court on point.  I don't know how much you

15  read into it in terms of the analysis, but -- so I'm not sure

16  I am bound by that.

17          MR. HARDIMAN:  Okay.  We'd respectfully --

18          THE COURT:  Again, I'm very sensitive to this whole

19  idea of not wanting to get into refereeing insurance battles

20  for every nickel, dime case that comes down the pike, and

21  this is certainly not a nickel, dime case.

22          MR. HARDIMAN:  We think that it is law of the case

23  because it is a pure legal issue and there's no

24  differentiating factor with Mr. Rocha in this particular

25  case. With respect to the coverage provisions, yes, it is a

1   different -- he is a different animal --

2          THE COURT:  Right.

3          MR. HARDIMAN:  -- he has a different job.  But with

4   respect to the jurisdictional question, it is identical.

5             With respect to their arguments on

6   jurisdiction, we believe the Court properly applied the

7   Kokkonen factors.  We also belief this idea that you can only

8   exercise ancillary jurisdiction where it only arises out of

9   the underlying -- the related action, the criminal action, is

10  not a correct representation of the law.  If you look --

11         THE COURT:  It is not an unreasonable

12  interpretation given Justice Scalia's analysis.  It is the

13  hardest thing that I have had to deal with.

14         MR. HARDIMAN:  Understood, Your Honor.

15            I think what it goes to is there is no clear

16  delineation --

17         THE COURT:  That's for sure.

18         MR. HARDIMAN:  -- in terms of factors.

19            The Second Circuit test laid out in Chesley

20  versus Union Carbide if the claim is sufficiently related to

21  an initial claimed properly before the Court.  It's not that

22  it has to arise out of and it can only be applied where it

23  arises out of.

24            We would also agree with the Court's reasoning

25  in the Li action that it clearly is factually interdependent

1   with the criminal action.  They have -- the defendants have

2   raised the willful misconduct exclusion, for example, that is

3   dependent on what facts are established in the criminal

4   action.  If he is adjudged to be guilty that is potentially

5   implicated for insurance coverage purposes.  They are

6   completely intertwined.  The allegations in the indictment

7   allege that he was employed by FIFA as a development officer.

8   Again, that is central to the issue that they are here about

9   arguing today, whether he was employed.  The allegation has

10  been made that he was employed so that he is entitled to

11  insurance coverage under the provisions of the policy.  They

12  couldn't be closer.  There are numerous courts who have ruled

13  that matter of fee disputes are properly subject to ancillary

14  jurisdiction.

15          The other --

16          THE COURT:  Let me interrupt.  Do the practical

17  implications here -- I have got this monster criminal case.

18  You know where I am going.  I have this monster criminal case

19  that I am trying to move along down the road despite the -- I

20  forget the word.  Terabyte?  The terabytes of information

21  that have been exchanged and have yet to be exchanged.  I'm

22  trying to move the case along.  It has a lot of lawyer time,

23  involves a lot of lawyers, secondary expense.  I don't have

24  to explain that to you.  Do those practical implications of

25  getting counsel in place -- I realize they are in the case,

1   but you know what I am talking about.  Don't they count at

2   all in the analysis?

3            MR. KNOERZER:  Not unless you can get past the

4   threshold issue, Your Honor, that I have described before.

5   You have to get past this interdependent factual

6   interdependence.  The courts all say that.  The Kroger case,

7   your clerks can look at.  They all say the same thing.  You

8   do not find ancillary jurisdiction until you answer that

9   question.  The convenience or the efficiency does not matter,

10  cannot be discussed until you get past that.  The Supreme

11  Court is very clear on that.

12           THE COURT:  I wish they were so clear.

13           MR. KNOERZER:  Your Honor, there are other

14  practical aspects.  In a normal coverage thing, the first

15  thing I would do is take Mr. Rocha's deposition.  I can't

16  take Mr. Rocha's deposition in your case; he's not going to

17  answer a single question.  These are oil and water, these two

18  cases.  That's why the Polishan case, the Middle District of

19  Pennsylvania, dealt with this precisely.  And I apologize

20  that we haven't put that before Your Honor until -- for your

21  consideration.  It is the Middle District of Pennsylvania.

22  It's a million miles away from here, but on the other hand,

23  we think it's a very well-reasoned decision and it relies on

24  United States Supreme Court authority.

25           THE COURT:   I'm not surprised to hear you say that

1   as you did in your letter.

2          MR. KNOERZER:  One or two other points, Your Honor.

3   There was an awful lot of discussion here about what the FIFA

4   victim statements says.  It says, according to counsel, it

5   called Mr. Rocha an employee.  You have lots of clerks here.

6   I challenge them to find anywhere where FIFA called Mr. Rocha

7   an employee.  I challenge them to find where FIFA said that

8   he drew a salary.  It says no such thing.

9          THE COURT:  How do they characterize the funds that

10  they seek to --

11         MR. KNOERZER:  He is an independent contractor.

12  They paid him like an independent contractor.  That's what

13  the agreement says.

14         THE COURT:  To be frank, I haven't looked at what

15  we are now calling the FIFA Complaint apparently.  But is

16  that accurate?

17         MR. HARDIMAN:  Your Honor, on page 17 of the FIFA

18  Complaint, it says the Defendant, including Rocha, by

19  depriving FIFA their honest services, the Defendant UMTA

20  unfairly obtained money from FIFA in the form of salaries.

21  So I accept counsel's challenge and there we have it.  It is

22  on page 17.

23             On page 15, he is called -- Mr. Rocha is

24  called an official of FIFA and specifically named as a FIFA

25  development officer.

1          On page 8, Mr. Rocha exploited their,

2    including Mr. Rocha, FIFA positions to enrich themselves.  It

3    seeks $387,781 in salary, amounts paid by FIFA to Mr. Rocha,

4    on page 19.  So, Your Honor, we -- I think it is clear that

5    FIFA regarded him as an employee.

6          Irrespective of that, we still haven't heard

7    why he wouldn't get insurance coverage for being a general

8    agent or a representative of FIFA.  At a minimum, he's a

9    representative.  There is no question about that.

10         I would like to go back to the jurisdictional

11   question for a moment.

12         THE COURT:  Go ahead.

13         MR. HARDIMAN:  The Court was inquiring about the

14   practical aspects of this.  That is a component.  If you look

15   at the Weissman case, which is cited in Defendants' papers,

16   in that case they talk about the availability of an

17   alternative forum of competent jurisdiction where you could

18   reasonably expect that you could get a required ruling.

19   Well, as Defendants recognized in the Li case, while there

20   may be an alternative forum in Switzerland, even Defendants

21   didn't disputed and admitted that it would take at least a

22   year to get any sort of ruling out of a Swiss court.  So,

23   that effectively, under the Weissman case, means that the

24   ruling that is required in this case, whether it is a summary

25   judgment or preliminary injunction on the advancement of

1   defense costs, which is the purpose of the D & O insurance

2   policy, the central issue in the case, a year would go by and

3   it would essentially defeat the entire purpose of the D & O

4   policy.  We can't get a ruling, even as admitted by the

5   Defendants, in a Swiss court in time.  That was central, I

6   think, to the practicalities and central to the Weissman

7   analysis as to whether there is in fact an available forum

8   where you could reasonably expect a ruling to come out on the

9   issue presented.  So the practicalities are part of factors.

10          THE COURT:  There is sort of an exchange of points

11  on this whole question.  You said it in your papers, if I

12  were to grant the preliminary injunction, I'm giving

13  plaintiff's everything they can conceivably want or need, a

14  full victory.  On the other hand, if I don't, what they

15  contracted for, which, from their perspective, the

16  advancement of funds, fees, and so forth, is gone forever.

17  How do I reconcile that?

18          MR. KNOERZER:  Your Honor, this man, Mr. Rocha,

19  didn't contract for this coverage under the policy.  He may

20  have as president of the other organization that he was a

21  president of contracted for coverage, but he did not contract

22  with FIFA.  He did not contract with us.

23          THE COURT:  Well, the question, of course, is is he

24  an insured person.  Let's assume for the sake of argument

25  that he is.  What's left?  Is he not entitled to the

1   advancement of funds as per the contract?

2          MR. KNOERZER:  If you find, Your Honor, that he is

3   an insured person and if you find that his activity fell --

4   the alleged activity that he is accused of falls within the

5   scope of his duties as an insured person, the scope of his

6   work as an insured person, then he would be entitled to a

7   defense.  And if the man later is accused of willful

8   misconduct and is convicted for it or admits to it, we would

9   be entitled to our money back.  We are not denying what the

10  policy says, Your Honor.  We are here to say two things:  We

11  are in the wrong forum and the man isn't wearing an insured

12  person's hat.

13         THE COURT:  You have a dispute that is going to

14  take at least a year or so to go back to Switzerland,

15  litigate the fact there and get some sort of a resolution.

16         MR. HARDIMAN:  I think, Your Honor, that goes into

17  to the central issue in terms of balance of hardship.  The

18  Defendants can get their money back.  Mr. Rocha can't get his

19  defense back.

20         THE COURT:  I understand.

21         MR. HARDIMAN:  That's what it comes down to.  I

22  mean, the entire purpose of the policy would be defeated

23  whether -- if a preliminary injunction isn't granted or if

24  the Court doesn't properly exercise its ancillary

25  jurisdiction, as it has already found it has the right to do.

1    As admitted by the Defendants already, Mr. Rocha will not be

2    able to get a ruling in Switzerland that doesn't defeat the

3    very purpose in terms of timing.

4              THE COURT:  Why does it defeat?  It leaves you

5    hanging.

6              MR. HARDIMAN:  The purpose of advancement of

7    defense costs, it leaves Mr. Rocha hanging because he will be

8    unable to properly fund and mount a defense to a complex

9    matter and serious matter where his liberty is at stake.

10             MR. KNOERZER:  Your Honor, there are a couple of

11   things:  One, I'm sure the Court can read the FIFA's victim

12   statement for itself and see what it says and what it does

13   not say.

14             Secondly, I noticed that counsel now is

15   relying on two things that they didn't rely on in their

16   papers.  Number one, they never cited the Weissman case,

17   which has been criticized.  Whether it deserve a criticism or

18   not, it's an outlier.  Nobody cites the Weissman case for

19   authority.  And I don't believe that they have.

20             Lastly, Your Honor, what their entire case now

21   comes down to is not an argument that ancillary jurisdiction

22   actually exists on the merits, what they are saying is either

23   one, you decided it already, don't look at it again, or, two,

24   this is entirely a hardship case.  Hardship is -- I have got

25   nothing against Mr. Rocha personally, but hardship is not the

1   standard.  The standard is whether there is something in the

2   insurance matter that resolution is required in order to help

3   him in the defense of his criminal proceedings and that's not

4   the case here, and that what Kokkonen stands for.

5           THE COURT:  I don't understand that.  I just don't

6   understand getting resolved the question of resources to

7   afford a defense.  It seems to me so fundamental.

8           MR. KNOERZER:  The Second Circuit in the Stein case

9   spoke, Your Honor, to this issue.  One of the things that

10  they said -- they have made the same argument, calling it a

11  fee dispute.  What the Second Circuit in Stein said is a fee

12  dispute is, quote, a world away from the exercise of

13  ancillary jurisdiction in a criminal proceeding to adjudicate

14  a contract dispute.  That's what was said in Stein.  What

15  Stein said is trying to bring a contract dispute into a

16  criminal proceedings is a world away from one another.  It's

17  different from a fee dispute.

18          Your Honor, you clearly would be making new

19  law, I believe, if you rule that an insurance coverage action

20  could be brought into a criminal proceeding, and policies

21  written all over the world would be dragged into every

22  criminal proceeding.

23          THE COURT:  Well, that is the slippery slope aspect

24  of this that has always been a concern of mine.

25          It is your application, so I turn it back to

1    you.

2           MR. HARDIMAN:  Your Honor, with respect to the

3    Weissman case, it has been cited.  It is -- Defendants rely

4    on it in their opposition.  They state, on page 13, the

5    closest analog to the case at bar in which a Court has

6    exercised ancillary jurisdiction is United States versus

7    Weissman.  I want to dispel the notion that Weissman

8    apparently has no relevance this to proceeding.

9           THE COURT:  They go on to say a lot more.

10          MR. HARDIMAN:  What they go on to argue is the

11   availability of an alternative forum where there is a

12   reasonable expectation that a ruling could be obtained.

13   Well, if Weissman applies here, they have already admitted in

14   the Li case that there is no reasonable alternative in

15   Switzerland to get a ruling on these issues in a timely

16   manner with respect to the issue at bar.

17              The slippery slope argument with respect to

18   jurisdiction, this is not a slippery slope.  This is a unique

19   case involving what they chose to insure, American risks.

20   The policy explicitly insures worldwide, including the United

21   States, risks in the United States.  They chose to put a

22   Swiss forum clause in there and Swiss jurisdiction clause.

23   What is happening here is they are simply bearing the

24   consequences of that decision.  It turns out that the

25   jurisdiction that they chose in this particular case, where

1   there are criminal proceedings in the United States against

2   their insured, is not an adequate forum to decide the issues

3   presented under the policy.

4          THE COURT:  Okay.  Anything else?

5          MR. KNOERZER:  Only, Your Honor, I'm not much for

6   predictions, but I can tell you that if this is a unique

7   case, you are going to see about 20 more unique cases coming

8   down the pike.

9          THE COURT:  Your admonition is appreciated.

10         MR. KNOERZER:  Thank you, Your Honor.

11         THE COURT:  But where do we stand on your motion?

12  Do you have a schedule?  What are we doing about that?  Are

13  we go to wait to see what happens?  What are we going to do

14  with your motion?

15         MR. KNOERZER:  I believe we need Your Honor's

16  permission to file it after we submitted the letter.

17         THE COURT:  Well, you have my permission.

18         MR. KNOERZER:  Rules is rules.

19         THE COURT:  I need a schedule.  I need to bring

20  this to a head.

21         MR. KNOERZER:  Very good.

22         THE COURT:  And I will do my best in the interim to

23  get this back out to you.

24         MR. HARDIMAN:  Your Honor, may I add one point?

25  Just going back to the beginning of the hearing, Your Honor

1    inquired about Mr. Rocha's financial wherewithal.  To the

2    extent that the Court has concerns about evidence regarding

3    his financial wherewithal in making its decision on the

4    preliminary injunction motion, we can, in very short order,

5    provide the Court with appropriate --

6              THE COURT:  Let me put it to you this way, Mr.

7    Hardiman, I try to make it a stern rule not to advise or

8    coach the litigants.  I'm going to leave it at that.

9              MR. HARDIMAN:  Thank you, Your Honor.

10             THE COURT:  Thank you, gentlemen, I appreciate your

11   time.

12             MR. KNOERZER:  Thank you, Your Honor, for your

13   time.

14                          *    *    *    *    *

15

16   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

17

18        /s/ MICHELE D. LUCCHESE              June 23, 2016
     _____    _____
19        MICHELE D. LUCCHESE                      DATE

20

21

22

23

24

25