UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
JULIO ROCHA,

                Plaintiff,                      **MEMORANDUM & ORDER**

                - against -                      16 CV 2327 (RJD) (CLP)

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON, AXIS SPECIALTY EUROPE SE,

                Defendants.
------------------------------------------------------------- x
DEARIE, District Judge

       Julio Rocha, a defendant in United States v. Webb, No. 15-cr-252, a complex criminal prosecution against individuals associated with the Federation Internationale de Football Association ("FIFA"), its member associations, and sports marketing companies, moves for a preliminary injunction requiring the defendant insurers ("Insurers") to pay his defense and extradition costs. The underlying facts and legal issues presented by this case are familiar to the Court. On April 27, 2016, the Court granted a similar motion for a preliminary injunction brought by Rocha's co-defendant, Eduardo Li, against the same Insurers and under the same insurance policy, requiring them to pay his defense and extradition costs. See Li v. Certain Underwriters at Lloyds, London, No. 15-cv-6099 (RJD), 2016 WL 1706125 (Apr. 27, 2016 E.D.N.Y.) (hereafter "Li"). For the reasons that follow, Rocha's motion for a preliminary injunction is also granted.

## BACKGROUND

       As described in Li, the Insurers sold FIFA a "Directors and Officers Legal Liability Policy" (the "Policy"). ECF No. 9-3; see also Li at *1, 10-12 (describing the Policy). The Policy provides "world-wide" coverage to "Insured Persons" for "defense costs incurred to

defend any actual or alleged wrongful acts and also Investigation costs," as well as reasonable legal fees related to extradition proceedings. Policy § 1.1. As relevant here, the definition of an "Insured Person" under the Policy includes "employees" of FIFA who are either "acting in a managerial or supervisory capacity" or "named as a co-defendant with a President, Vice President or Member" of FIFA, as well as "general agents/representatives" of FIFA. Id. § 1.3. Under the "willful misconduct" provision of the Policy, if an Insured Person is "found guilty of wrongful intent," he or she "will be obliged to reimburse the Insurer for all payments made on his or her behalf." Id. § 3.1

From January 2013 to June 2015, plaintiff Julio Rocha served as FIFA's Development Officer based in Panama.[1] Rocha Decl. ¶ 3, ECF No. 9-10. In this position, he "was responsible for overseeing, managing and supervising FIFA's development efforts in Central America" and received compensation in the amount of $7,000 per month. Id. ¶ 3; ECF No. 17-3 at 3. In connection with the position, Rocha entered into a "Development Officer Agreement" (the "Agreement") with FIFA. Agreement, ECF No. 17-3. The Agreement provides that the Development Officer position "is entered into with respect to a one-off service and does not form the basis for an ongoing mandate or a regularly recurring agency relationship" and that the Development Officer "shall act independently, outside the organizational structure of FIFA and shall have his own work plan." Id. §§ 1.1, 1.2. It also provides that "[t]his agreement does only authori[z]e or entitle the [Development Officer] to act as a representative of FIFA in any de facto or de jure capacity upon instructions." Id. at § 1.4.

By indictments returned on May 20, 2015, and November 25, 2015, Rocha is charged with racketeering conspiracy, wire fraud, wire fraud conspiracy, money laundering, and money

---

[1] Prior to his role as FIFA Development Officer, Rocha served from 1986 to 2012 as the President of Federacion Nicaaraguense de Futbol ("FENIFUT"), a member association of FIFA.

2

laundering conspiracy in connection with his positions as a FIFA Development Officer and President of Federacion Nicaraguenese de Futbol ("FENIFUT"). Among other allegations, the indictment charges that "[o]n or about February 25, 2014," while Rocha "was employed by FIFA as a development officer," he participated in a scheme to award the media rights of FENIFUT's 2022 World Cup qualifier matches to alleged co-conspirators in exchange for bribe payments. Superseding Indictment ¶ 254, Nov. 25, 2015. On July 1, 2015, the United States Department of Justice and the United States Attorney's Office for the Eastern District of New York submitted a request for Rocha's extradition to the Swiss Federal Office of Justice. Pl.'s Br. 5-6, ECF No.9-9.

By letter dated November 24, 2015, Rocha notified the Insurers of his indictment and then-pending extradition and requested immediate reimbursement and advancement of legal costs under the Policy. The Insurers responded on December 16, 2015, advising that Rocha "would be covered under the Policy in principle only to the extent that he falls within the definition of an Insured Person set forth in Clause 1.3" and "acted in his capacity as an Insured Person pursuant to Clause 1.1." Letter of Insurers ¶¶ 4,6, dated Dec. 16, 2015. In addition, they "reserve[d] all other rights under the Policy . . . including, but not limited to, the exclusions for willful misconduct" and requested, in order to substantiate his claim, a "contract of employment with FIFA along with a description of his role and the services provided to FIFA." Id. ¶¶ 7-8. Rocha thereafter provided the requested information, but the Insurers did not respond.

On March 15, 2016, FIFA filed a Victim Statement and Request for Restitution (the "Victim Statement") with the Department of Justice. In the Victim Statement, FIFA states that Rocha "diverted money from the local and regional federations to [his] own pocket[] . . . using the goodwill and good name of FIFA and greatly tarnished the brand of the FIFA World Cup . . .

both when he was president of the Nicaraguan football federation and later after he stepped down and became a FIFA development officer." Victim Statement at 15, ECF No. 9-5.

Rocha wrote the Insurers again on March 30, 2016, requesting advancement and reimbursement of defense costs. The Insurers did not respond, and to date, Rocha has received no reimbursement or advancement of legal costs under the Policy. On June 22, 2016, Rocha submitted an affidavit advising the Court that neither he nor his immediate family has the resources to pay his defense costs. Suppl. Decl. of Rocha, dated June 22, 2016, ECF No. 20.

Rocha filed a breach of contract action against the Insurers on May 9, 2016, asserting that this Court has ancillary jurisdiction over the matter. On June 1, 2016, he moved for a preliminary injunction requiring the Insurers to pay the "defense costs associated with an indictment issued by the Grand Jury for the Eastern District of New York, a related request by the United States Government to the Swiss authorities to extradite Plaintiff to the United States to stand trial, and the Victim Statement and Request for Restitution filed by FIFA in connection with the indictment." ECF Nos. 9,10.

DISCUSSION

In granting a preliminary injunction in Li, the Court exercised ancillary jurisdiction. See Li, No. 15-cv-6099 (RJD), 2016 WL 1706125, at *3-4. The essential factors supporting ancillary jurisdiction and a preliminary injunction in Li apply with equal force in this closely related action.

A. *Ancillary Jurisdiction*

As in Li, the Court finds that ancillary jurisdiction is warranted on two independent grounds. See id. at *3 (setting out relevant law). First, Rocha's criminal proceeding and this action are "factually interdependent," as both turn, in material part, on the nature of Rocha's

4

relationship with FIFA and his conduct while affiliated with FIFA. See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 378 (1994) (ancillary jurisdiction properly asserted "to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent"). Second, as in Li, the Court exercises ancillary jurisdiction over this action to successfully manage its proceedings in United States v. Webb, 15-cr-252. See Li at *3; Kokkonen, 511 U.S. at 378 (ancillary jurisdiction properly asserted "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees").

Furthermore, as in Li, the analysis set out in Stein v. KPMG, 486 F.3d 753 (2d Cir. 2007), supports the Court's exercise of ancillary jurisdiction. See Li at *4 (explaining relevant law). The Insurers face no more discernible prejudice in this case than they did in Li, where, confronted with a related and parallel suit involving the same policy, they sought out this forum. Id.[2] For the purposes of Stein, the Insurers remain "before the court," and, as explained in Li, are "not the kind of 'non-parties' whose interests concerned the Stein Court." Li at *4 (discussing lack of prejudice faced by Insurers). As in Li, the Court finds here that the "need for

---

[2] Specifically, in Li, the plaintiff initially brought suit in state court on September 24, 2015. The Insurers removed to federal court on October 23, 2015, asserting that the Court had diversity jurisdiction to hear the claim. Six days later, on October 29, 2015, the Insurers filed a letter indicating their intent to move to dismiss for *forum non conveniens*. Thereafter, on November 18, 2015, Li submitted an order to show cause, seeking a preliminary injunction requiring defendants to pay plaintiff's defense costs. Defendants then notified the court on December 1, 2015, that removal "may have been incorrect."
    The Court reiterates its observation in Li that Lloyd's and its affiliates are no strangers to this forum, thus undermining defendants' claims of prejudice in appearing in this forum. Since 2014, Lloyd's affiliates have commenced at least three actions in this district: Certain Underwriters at Lloyd's London v. National Railroad Passenger Corporation, No. 14–cv–4717 (FB), 2016 WL 739061 (E.D.N.Y. Feb. 19, 2016); Certain Underwriters at Lloyd's London v. National Railroad Passenger Corporation, No. 14–cv–4717 (FB), 2015 WL 1182764 (E.D.N.Y. Mar. 13, 2015); Certain Underwriters at Lloyd's London v. Art Crating, Inc., No. 12–cv–5078 (NGG), 2014 WL 123488 (E.D.N.Y Jan. 10, 2014).

the ancillary proceeding" and the "efficiencies provided by it," are substantial, while the Insurers, as noted, face no discernable prejudice. Id.[3]

B. *Preliminary Injunction*

To obtain a preliminary injunction, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (quoting UBS Fin. Servs., Inc. v. W. Va. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011)).[4]

Rocha has established both that he faces irreparable harm and that the balance of hardships tips decidedly in his favor, for the reasons stated in Li. See Li at *9-10, 12; accord XL Specialty Ins. Co. v. Level Global Investors, L.P., 874 F.Supp.2d 263, 273, 276 (S.D.N.Y. 2012)

---

[3] The new arguments offered by the Insurers in this action principally derive from United States v. Polishan, 19 F. Supp. 2d 327 (M.D. Pa. 1998), and Peacock v. Thomas, 516 U.S. 349, 354 (1996)—cases that are easily distinguished. In Polishan, the court's refusal to exercise ancillary jurisdiction over a civil claim involving a non-party to the original criminal matter was premised on (a) the absence of a factual relationship between the claims and (b) the fact that the non-party was not already before the court. Id. at 332-33. Here, by contrast, (i) the criminal and civil actions are factually intertwined and (ii) the defendants are "parties before the Court—indeed they came of their own volition." Li, No. 15-cv-6099 (RJD), 2016 WL 1706125, at *3-4. In short, the fundamental reasons compelling the court to decline to exercise ancillary jurisdiction in Polishan are not present in this case.

In Peacock, the Supreme Court commented that it had "cautioned against the exercise of jurisdiction over proceedings that are entirely new and original." 516 U.S. at 356 (internal quotation marks omitted). The Insurers allude to these comments, suggesting that this is such a "new and original" proceeding. But neither this case, nor Li, constitute "entirely new and original" proceedings within the meaning of Peacock. There, a litigant asked the Court to exercise ancillary jurisdiction in relation to an action which had already concluded. Id. at 354. The Court explained its rationale for holding ancillary jurisdiction impermissible under the circumstances: "once judgment was entered in the original ERISA suit, the ability to resolve simultaneously factually intertwined issues vanished." Id. at 355. Here, the primary lawsuit is of course ongoing, and, as noted, exercising ancillary will allow the Court to resolve factually intertwined issues. Thus, Peacock supports this Court's exercise of ancillary jurisdiction.

[4] Rocha's preliminary injunction is not subject to a heightened showing because here, as in Li, the injunction will require the Insurers "to advance legal fees as they allegedly should have done earlier under the terms of the Policy, and the Insurers have the right to recoup those payments if successful on the merits." Li at *9; see also Johnson v. Kay, 860 F.2d 529, 541 (2d Cir. 1988) (heightened showing not required where the injunction sought requires the party "to do what it should have done earlier" and does not provide the movant with all the relief sought); In re World Com, Inc. Sec. Litig., 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) (declining to apply heightened standard to preliminary injunction requiring Insurer to advance criminal defense costs).

(finding that insurer's refusal to pay costs of insured's criminal defense constituted "'extreme or very serious damage,' the highest of the standards the Second Circuit uses to measure irreparable harm," and that the balance of hardships tipped "not only decisively but lopsidedly, in favor of the Insureds"); In re World Com, Inc. Sec. Litig., 354 F. Supp. 2d 455, 463 n.10, 469 (S.D.N.Y. 2005) (holding that "[t]he failure to receive defense costs under a professional liability policy at the time they are incurred constitutes an immediate and direct injury" sufficient to satisfy the irreparable harm requirement and that the balance of hardships tips "decidedly" in plaintiff insured's favor).[5]

Rocha has also established a likelihood of success on the merits. The Insurers disclaim an obligation under the Policy on the grounds that Rocha (i) is not an Insured Person under Section 3.1 and (ii) did not commit the alleged criminal conduct in his capacity as an Insured Person. As relevant here, the Policy defines Insured Persons as, among other things, "general agents/representatives" of FIFA. Policy § 3.1. Rocha has shown that he is a "representative" of FIFA by virtue of his position as a FIFA Development Officer from 2013 to 2015—a position in which he "was responsible for overseeing, managing and supervising FIFA's development efforts in Central America" and for which he received compensation in the amount of $7,000 per month. Rocha Decl. ¶ 3; Agreement § 3.1.

Defendants argue that Rocha does not qualify as a "representative" merely because the *Agreement* provides that he was "only authori[zed] or entitle[d] . . . to act as a representative of FIFA in any de facto or de jure capacity upon instructions," Agreement § 1.4, but this argument

---

[5] As in Li, the Insurers initially argued that Rocha failed to establish irreparable harm because he could not show that he lacked the means to pay his legal fees. This argument was rejected in In re WorldCom, Inc. Sec. Litig., 354 F. Supp. 2d 455, 469-70 (S.D.N.Y. 2005) (finding irreparable harm where insurers disputed any obligation to advance defense costs and explaining that "[t]he issues here surmount whether an individual director has or does not have sufficient funds to pay counsel."). In any event, Rocha has submitted an affidavit demonstrating that neither he nor his family has the resources to pay his legal fees. See Suppl. Decl. of Rocha, dated June 22, 2016. Accordingly, the Insurers' argument is unavailing.

7

is unavailing. First, the terms and definition of the *Policy* control. Second, FIFA's own statement that Rocha, while serving as a FIFA Development Officer, "us[ed] the goodwill and good name of FIFA and greatly tarnished the brand of the FIFA World Cup," Victim Statement at 15, is strong evidence that Rocha indeed acted as a "representative" within the meaning of the Policy and is therefore an Insured Person.[6]

Furthermore, even if the Policy entitles Rocha to coverage only if he *committed the underlying conduct in his capacity* as an Insured Person, as defendants contend, FIFA's statement that Rocha "us[ed] the goodwill and good name of FIFA" in allegedly committing misconduct, as well as the allegations in the Indictment that Rocha "was employed by FIFA as a development officer" when participating in a scheme to trade media rights for World Cup qualifier matches for bribe payments, constitute strong proof that Rocha's alleged conduct occurred in his capacity as a FIFA Development Officer. Accordingly, Rocha has shown a likelihood of success on the merits.

## CONCLUSION

For all of the foregoing reasons, Rocha's motion for a preliminary injunction is granted.
SO ORDERED.

Dated: Brooklyn, New York
September 26, 2016

s/ RJD

RAYMOND J. DEARIE
United States District Judge

---

[6] Whether Rocha also qualifies as an "agent" or an "employee" of FIFA under the Policy are "serious questions going to the merits" that, coupled with the Court's conclusion that the balance of hardships tips "decidedly" towards Rocha, constitute independent grounds also warranting a preliminary injunction. Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 215 (2012).

8